THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ROY M. WILLIS, Defendant-Appellant.

First District (2nd Division)   No. 1—01—4170

Opinion filed November 18, 2003.

870

Law Offices of James K. Leven, of Chicago (James K. Leven, Panel Attorney for State Appellate Defender's Office, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Mary P. Needham, and Deborah Lang-Lawler, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

Seventy-three hours after he was arrested, Roy Willis confessed to setting a fire that caused a death. We find his arrest was based on probable cause, but that his detention had become unlawful by the time of the confession. We address a question never clearly answered in this State: What is the proper remedy for a violation of the fourth amendment right to a prompt probable cause determination by a judge?

BACKGROUND

After a bench trial, at which defendant's confession represented the great weight of the State's case, Willis was found guilty of criminal damage to property exceeding $300 and sentenced to three years' imprisonment. At trial, defendant attacked the admission of his confession on several grounds, but on appeal he presents us with only two reasons for suppression, both relying on the fourth amendment.

First, defendant contends the police lacked probable cause to justify his arrest. Second, he contends his confession should be suppressed because the police failed to take him before a judge for a probable cause determination before he confessed. Although defendant also contended at trial that mistreatment by the police caused him to make an involuntary confession, he does not make that claim in this appeal. While we find the initial arrest was based on probable cause, we conclude the lengthy detention before any judicial intervention violated the Fourth Amendment and that suppression of the confession is the proper remedy. We reverse the defendant's conviction.[1]

FACTS

The trial court conducted separate hearings on defendant's motion to quash arrest and his motion to suppress the confession. In discussing the facts, we combine the testimony from the two hearings, summarizing the evidence that is pertinent to the fourth amendment inquiries.

Detective Michael Lueser of the Chicago Heights police department testified he investigated a June 14, 1999, fire at an apartment

---

[1]The defendant also claims his conviction should be reduced from a Class 4 felony to a Class A misdemeanor, but there is no need to address that contention given our decision on the fourth amendment issue.

located at 299 East 16th Street in Chicago Heights. Due to the fire, the apartment's occupant, Morgan Beauchamp, died of smoke inhalation.

Detective Lueser questioned Beauchamp's neighbor, Ralph Lawson, on June 16, 1999. Lawson told Lueser he saw Kimberly Brodanex visit Beauchamp between 8 and 9 p.m. on June 14, 1999. Lawson said Brodanex occasionally was Beauchamp's girlfriend. On the night of the fire, Brodanex told Lawson she was going to Beauchamp's to get her sweater. Lawson saw Brodanex leave after retrieving her sweater.

At around 9:30 p.m., defendant, who appeared angry, approached Lawson and asked if he had seen Brodanex. Lawson told defendant he saw Brodanex earlier and that she went to 15th Avenue. Lawson observed defendant walk to the back of Beauchamp's building, but lost sight of him for a few minutes before seeing him walk away from the rear of the building. Several minutes later, Lawson smelled smoke and discovered the second-floor porch area of Beauchamp's apartment was in flames. Beauchamp appeared on his front porch, and Lawson told him to try to leave the apartment. Beauchamp never reemerged. Lawson told Lueser he did not see anyone else near Beauchamp's porch at the time.

Detective Lueser testified he questioned Brodanex after his conversation with Lawson. Brodanex told Lueser she was sometimes involved with defendant and had lived with him prior to June 14, 1999. On the day of the fire, Brodanex moved out of defendant's apartment because she had a criminal case pending against him for beating her. On the day of the fire, Brodanex moved her belongings from defendant's residence to Beauchamp's rear porch. After she left her belongings at Beauchamp's apartment, she used a pay phone on 15th Avenue, approximately one block away, to call a man. The man picked her up and they drove to Sauk Village. When Brodanex returned, the fire department was at the apartment.

After the fire, Lawson told Brodanex about his earlier encounter with defendant. The next morning, Brodanex went to defendant's apartment to confront him about the fire. Defendant responded, "Why would I have anything to do with that when he had been good to [sic]." Defendant admitted he went to Beauchamp's apartment to look for Brodanex at around 9 p.m. on the night of the fire. Brodanex told Detective Lueser something under defendant's bed smelled like it was burning, although Brodanex did not look under the bed to determine what caused the odor.

Detective Lueser also reviewed the fire marshals' reports. Fire marshal Hitchcock investigated the fire first. His report indicated the fire started in the rear porch ceiling area, but he could not determine the origin or cause of the fire.

On June 24, 1999, fire marshal Mitchell Kuhner issued the official determination as to the cause and origin of the fire. Kuhner concluded the fire was intentionally set on the second-floor porch using an open flame without the aid of an accelerant.

Although Detective Lueser made several attempts to question defendant, Lueser did not locate defendant until July 13, 1999. On that day, Detectives Lueser and Bruni found defendant at his residence and asked him if he would accompany the detectives to the police station to discuss the fire at Beauchamp's residence. Defendant agreed to go with the officers. He was not handcuffed and rode in the backseat of an unmarked squad car to the station. The detectives and defendant entered the station through a back door that was accessible only to police personnel. The detectives placed defendant in an interview room where they read defendant the *Miranda* warnings. The record includes the written *Miranda* waiver signed by defendant and dated July 13, 1999, at 4:10 p.m. The form states in part:

"I, Roy M. Willis, now being held *in custody* by the Chicago Heights Police Department state that upon my arrival and *detention* I was immediately informed of my Constitutional Rights as [f]ollows: ***." (Emphasis added.)

The detectives and defendant briefly discussed the fire. Defendant denied any involvement and denied going to Beauchamp's residence on the day of the fire.

At 8:30 p.m., Detective Lueser advised defendant he was under arrest and took him to the lockup. Detective Lueser did not have a warrant for defendant's arrest. According to Lueser, defendant was "placed on hold pending further investigation." When asked on cross-examination what further investigation he needed to complete, Lueser replied, "Locate any other witnesses, if possible."

Lueser testified other detectives went to locate Lawson and Brodanex after Lueser began questioning defendant on July 13, 1999, in case the police needed the witnesses to talk to a State's Attorney. Neither witness was brought to the police station that day. Lueser worked from 1 p.m. to 9 p.m. each day during defendant's detention. Neither he nor any other officer investigated defendant's case when Lueser was not on duty.

When Lueser returned to work on July 14, 1999, he attempted to locate Lawson, Brodanex, and "any other potential witnesses" and did not speak with defendant. Although Lueser spent a "good portion" of his eight-hour shift working on defendant's case, he admitted it was not the only police matter he worked on that day.

On July 15, 1999, Lueser tried again to locate witnesses and also spoke with defendant for five minutes regarding the polygraph test

defendant voluntarily submitted to earlier that day. Defendant did not make any admission regarding the crime.

On July 16, 1999, Lueser contacted Lawson and brought him to the police station. Lueser's partner, Detective Bruni, brought Brodanex to the police station that same day. At about 5 p.m., 73 hours after defendant's custodial detention began, defendant signed another *Miranda* waiver and agreed to give Detective Lueser a written statement implicating himself in the crime. The next morning at 7:30, the police presented defendant to a magistrate for a bond hearing. The July 17 hearing was the first time defendant appeared before a judge. The hearing came 87½ hours after the detention began.

Detective Lueser testified defendant never complained about not receiving food during the time he was in the lockup, nor did he ask to make any phone calls. Lueser denied misinforming defendant about the evidence police had obtained against him, threatening defendant, or promising leniency in exchange for defendant's cooperation. Lueser also testified he never heard any other officer do any of those things. Defendant never complained to Lueser about being threatened, and when giving his statement, defendant answered "yes" when asked if he was making his statement of his own free will and not through fear, inducements, or promises.

The State submitted the two *Miranda* waiver forms signed by defendant and dated July 13, 1999, and July 16, 1999.

Robert Bartik, a polygraph examiner for the Chicago police department, testified he administered a polygraph test to defendant at about 4:45 p.m. on July 15, 1999. Defendant signed a form acknowledging he was volunteering to take the test, and Bartik advised defendant of his *Miranda* rights. At the conclusion of the test, Bartik informed defendant he did not pass the polygraph test.

Chicago Heights police sergeant Jeff Bohlen testified the police were attempting to locate Lawson and Brodanex after defendant was detained, so they could speak with the State's Attorney and identify defendant. Bohlen testified the State's Attorney usually wanted to speak with witnesses before filing formal charges against a suspect.

The trial court found the police had probable cause to arrest defendant and denied his motion to quash arrest. Although the court determined the purpose of defendant's detention was to elicit a statement, the court found defendant voluntarily gave his statement and denied his motion to suppress.

Following the bench trial, defendant was convicted of felony criminal damage to property and sentenced to three years' imprisonment.

## DECISION

### I. Defendant's Arrest

Defendant contends the trial court erred in denying his motion to quash arrest and suppress his statement because the police lacked probable cause to arrest him on July 13, 1999.

■ When reviewing decisions on motions to suppress where the facts are undisputed, as they are here, we apply a *de novo* standard of review. *People v. McDaniel*, 326 Ill. App. 3d 771, 780, 762 N.E.2d 1086 (2001).

### A. *Time of custody*

■ First, we determine when defendant was in custody. Custody occurs when a person's movement is restrained by force or show of authority. *People v. Ollie*, 333 Ill. App. 3d 971, 981, 777 N.E.2d 529 (2002). The key inquiry is whether, under the circumstances, a reasonable person would have concluded that he was not free to go about his business. *Kaupp v. Texas*, 538 U.S. 626, 630, 155 L. Ed. 2d 814, 819, 123 S. Ct. 1843, 1845 (2003); *Ollie*, 333 Ill. App. 3d at 981 (voluntary presence at police station turned into unlawful detention with passage of time, the defendant confessing 33 hours into detention, and the cause remanded to determine whether his statement was sufficiently attenuated).

■ In this case, defendant voluntarily agreed to go with the detectives and rode in the backseat of their unmarked car; he was not handcuffed. Once defendant and the detectives arrived at the police station, defendant was placed in an interview room. At 4:10 p.m., the police read defendant his *Miranda* rights from a form, which defendant signed.

The language used by officers is an important fact to consider when determining whether an arrest occurred. See *Ollie*, 333 Ill. App. 3d at 981. In this case, defendant read and signed a *Miranda* form that stated he was *"now being held in custody* by the Chicago Heights Police Department" and "upon [his] arrival *and detention* [he] was immediately informed of [his] Constitutional Rights." (Emphasis added.) After reading he was being "held in custody" and detained, a reasonable person would not have believed he was free to terminate the questioning and leave the police station. *Thompson v. Keohane*, 516 U.S. 99, 112-13, 133 L. Ed. 2d 383, 394, 116 S. Ct. 457, 465 (1995); see *Ollie*, 333 Ill. App. 3d at 981. We find defendant was taken into custody when questioned by the police at 4:10 p.m. on July 13, 1999.

B. *Probable cause for the custody*

The next issue to be decided is whether the police had probable cause to arrest defendant at 4:10 p.m. on July 13, 1999.

■ Probable cause exists if the officer's knowledge includes facts and circumstances that would lead a reasonable person to believe the defendant had committed a criminal offense. *People v. Moody*, 94 Ill. 2d 1, 7, 445 N.E.2d 275 (1983).

We find the facts in this case strikingly similar to those in *People v. James*, 255 Ill. App. 3d 516, 525, 626 N.E.2d 1337 (1993). In *James*, the court found probable cause for the arrest based on the detective's conclusion the fire was due to arson and because there was evidence of the defendant's motive—anger toward his ex-girlfriend. According to the ex-girlfriend, the defendant entered her apartment building on the night of the fire and was angry about their relationship ending. The defendant hit and kicked her before leaving. Additionally, another witness saw the defendant in front of the building within an hour of the fire. *James*, 255 Ill. App. 3d at 525.

■ In this case, the fire marshal's official report concluded the fire on Beauchamp's porch was intentionally set and eliminated the possibility of accidental causes. Lawson told police he saw defendant walk toward the rear porch and leave minutes before Lawson smelled smoke. Defendant looked angry and was looking for his girlfriend, who was also occasionally involved with the victim. Brodanex told police she had moved out of defendant's apartment that day, and her belongings were in Beauchamp's porch on the evening of the fire. These facts mirror the three main bases for probable cause in *James*: (1) the fire was set intentionally; (2) defendant was seen near the building shortly before the fire started; and (3) he had motive—his anger toward his girlfriend. We conclude the police had probable cause to arrest defendant on July 13, 1999.

II. Defendant's Detention Between Arrest and Confession

Defendant contends his July 16, 1999, statement should have been suppressed because it was obtained in violation of his fourth amendment rights under the *McLaughlin/Gerstein* rule. See *County of Riverside v. McLaughlin*, 500 U.S. 44, 114 L. Ed. 2d 49, 111 S. Ct. 1661 (1991); *Gerstein v. Pugh*, 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975). His confession occurred 73 hours after his custodial detention began; police officers made no attempt to present him to a judge for a probable cause hearing during those 73 hours. Presentment did not come for another 14 1/2 hours.

■ In *Gerstein*, the United States Supreme Court observed that an individual's rights under the fourth amendment are best protected

when law enforcement officers obtain an arrest warrant from a neutral magistrate prior to an arrest. *Gerstein*, 420 U.S. at 112-13, 43 L. Ed. 2d at 64, 95 S. Ct. at 862. However, the Court recognized, in some circumstances, police needed the authority to make warrantless arrests. In such cases, the need for a neutral and detached determination of probable cause for the arrest does not evaporate:

> "Once the suspect is in custody," "[t]here no longer is any danger that the suspect will escape or commit further crimes while the police submit their evidence to a magistrate. And, while the State's reasons for taking summary action subside, the suspect's need for a neutral determination of probable cause increases significantly. The consequences of prolonged detention may be more serious than the interference occasioned by arrest. Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships. *** When the stakes are this high, the detached judgment of a neutral magistrate is essential if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty." *Gerstein*, 420 U.S. at 114, 43 L. Ed. 2d at 65, 95 S. Ct. at 863.

The Court held when police make warrantless arrests, the states must provide a probable cause determination by a judicial officer *promptly* after arrest. *Gerstein*, 420 U.S. at 125, 43 L. Ed. 2d at 71-72, 95 S. Ct. at 868-69. The court did not define "promptly."

In *McLaughlin*, the Court held the "promptness requirement of *Gerstein*" requires probable cause determinations by neutral magistrates within 48 hours of warrantless arrests. *McLaughlin*, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. If a suspect receives a probable cause determination within 48 hours of his arrest, a delay may still be unconstitutional if the defendant shows it was unreasonable. *McLaughlin*, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. The Court listed "delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake" as examples of unreasonable delays. *McLaughlin*, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.

If the delay is longer than 48 hours, the burden shifts to the State to show the delay was due to a "bona fide emergency or other extraordinary circumstance." *McLaughlin*, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.

■ In this case, defendant was placed in custody at 4:10 p.m. on July 13, 1999, and was presented before a judge for a probable cause determination at 7:30 a.m. on July 17, 1999—more than 87 hours later. He agreed to give an incriminating written statement 73 hours after his custodial detention began.

The 73-hour detention before defendant made his confession far exceeds the 48-hour period for a presumably reasonable delay. Accordingly, the "calculus changes" and the burden falls on the State to show an emergency or extraordinary circumstance is to blame. *McLaughlin*, 500 U.S. at 57, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.

Here, the State never attempted to make such a showing. We find no indication in the record the delay was the result of an emergency or extraordinary circumstance. In fact, Detective Lueser, the lead detective assigned to the case, testified investigation of defendant's case was limited to Lueser's eight-hour shifts, leaving 16 hours each day without any activity related to defendant's case. Lueser testified defendant was "placed on hold pending further investigation" and the purpose was to "locate any other witnesses if possible."

Lueser and Bohlen testified they were trying to locate Lawson and Brodanex so the assistant State's Attorney could interview them before filing charges against defendant. The belief the State's Attorney needs to reinterview witnesses before filing charges is not a "bona fide emergency or extraordinary circumstance" and does not excuse the 73-hour period between defendant's custodial detention and his confession. See *Kyle v. Patterson*, 957 F. Supp. 1031, 1034 (N.D. Ill. 1997) (waiting for the State's Attorney's office to approve charges was not an acceptable excuse for a *McLaughlin* violation). We find defendant's lawful detention became unlawful in violation of the fourth amendment to the United States Constitution after the passage of 48 hours. His confession came well into the time period after the detention turned unlawful. Next, we must determine the appropriate remedy for the violation.

III. The Remedy

■ The fourth amendment does not expressly provide for the exclusion of evidence in the event its provisions are violated. *Arizona v. Evans*, 514 U.S. 1, 10, 131 L. Ed. 2d 34, 43, 115 S. Ct. 1185, 1191 (1995). The exclusionary rule is a judicially created remedy that serves to deter law enforcement officials from violating the amendment in the future. *Evans*, 514 U.S. at 10, 131 L. Ed. 2d at 44, 115 S. Ct. at 1191. As a deterrent, the rule destroys any incentive police may have to disregard the fourth amendment by depriving them of any benefit gained by its violation. *Brown v. Illinois*, 422 U.S. 590, 599-600, 45 L. Ed. 2d 416, 425, 95 S. Ct. 2254, 2260 (1975). When applying the rule to fourth amendment violations, courts suppress evidence obtained as a result of illegal police activity, such as an illegal arrest. The evidence is considered "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 455, 83 S. Ct. 407, 417 (1963).

The fourth amendment exclusionary rule does not bar illegally obtained evidence in all cases. Exclusion of evidence is an extreme sanction and is applied only when the rule's deterrent purpose is "most efficaciously served." *Evans*, 514 U.S. at 11, 131 L. Ed. 2d at 44, 115 S. Ct. at 1191 (the exclusionary rule was not applied because suppression would not deter court employees from making similar clerical errors in the future); see also *United States v. Leon*, 468 U.S. 897, 916-21, 82 L. Ed. 2d 677, 694-97, 104 S. Ct. 3405, 3416-20 (1984) (exclusionary rule does not serve its deterrent effect where officer relied in good faith on a warrant which, as determined later, lacked probable cause—also known as the "good-faith exception"); *People v. Gabbard*, 78 Ill. 2d 88 (1979) (suppression would not serve a deterrent purpose because the officer who illegally arrested the defendant for an unrelated crime was not investigating the crime to which the defendant confessed); *Illinois v. Krull*, 480 U.S. 340, 350-55, 94 L. Ed. 2d 364, 375-79, 107 S. Ct. 1160, 1167-70 (1987) (where police were objectively reasonable in relying upon a statute that authorized warrantless administrative searches, but that was subsequently found unconstitutional, the exclusionary rule would not serve to deter future violations because the rule seeks to prevent police misconduct rather than legislative action); but see *People v. Krueger*, 175 Ill. 2d 60, 70, 675 N.E.2d 604 (1996) (Illinois Supreme Court declined to apply the good-faith exception under *Krull* based on state constitution grounds).

The United States Supreme Court has declined to specify the proper remedy for a *McLaughlin* violation, leaving it to the states. *Powell v. Nevada*, 511 U.S. 79, 84-85, 128 L. Ed. 2d 1, 7-8, 114 S. Ct. 1280, 1283-84 (1994). When *Powell* was remanded, the Nevada Supreme Court assumed suppressing the defendant's statement obtained during an unlawful detention under *McLaughlin* was the right remedy under certain circumstances. *Powell v. State*, 113 Nev. 41, 43, 930 P.2d 1123, 1126 (1997) (the court found the possible error was harmless because the defendant's statements during the detention duplicated admissible statements he made at the time of his arrest); accord *Chavez v. State*, 832 So. 2d 730, 754 (Fla. 2002) (finding the error of admitting a confession arising from a *McLaughlin* violation was harmless).

In addition to Nevada, several states have applied the exclusionary rule as the proper remedy for a *McLaughlin* violation following traditional fourth amendment analysis under the "fruit of the poisonous tree" doctrine (see *Wong Sun*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407) and the attenuation factors set forth in *Brown*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62. *E.g.*, *State v. Huddleston*, 924 S.W.2d 666 (Tenn. 1996); *Chavez*, 832 So. 2d 730; *Wil-*

*liams v. State*, 264 Ind. 664, 348 N.E.2d 623 (1976). Other jurisdictions, including this court under somewhat different circumstances, have applied fifth amendment analysis and held a *McLaughlin* violation warrants suppression only if the statement was involuntary. The length of the detention is only one of several factors considered under this approach. *E.g., People v. Groves*, 294 Ill. App. 3d 570, 577, 691 N.E.2d 86 (1998); *State v. Tucker*, 137 N.J. 259, 645 A.2d 111 (1994).

When faced with an alleged *McLaughlin* violation, the Illinois Supreme Court in *People v. Chapman*, 194 Ill. 2d 186, 215-16, 743 N.E.2d 48 (2000), did not limit its analysis to the issue of voluntariness. After finding the defendant's statement was voluntary, the court went on to determine suppression was not necessary under the fourth amendment because an emergency—finding the missing infant victim—justified the delay in presentment. *Chapman*, 194 Ill. 2d at 215-16.

■ Chapman's confession came 29 hours after his warrantless arrest, short of the *McLaughlin* line. The court recognized fourth amendment exclusion analysis differs from that performed under the fifth amendment, where the voluntariness of a statement is determined. Otherwise, there would have been no reason for a separate examination of facts that justified the delay in taking the defendant before a judge for a probable cause decision. Doing so, the court cited *Gerstein* and *McLaughlin*. *Chapman*, 194 Ill. 2d at 215. *Chapman* thus recognizes the fundamental differences between the goals of the fourth and fifth amendments as explained in *Brown*:

> "The exclusionary rule ***, when utilized to effectuate the Fourth Amendment, serves interests and policies that are distinct from those it serves under the Fifth. ***
>
> Thus, even if the statements *** were found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. In order for the causal chain, between the illegal arrest and the statements made subsequent thereto, to be broken, *Wong Sun* requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.' 371 U.S. at 486." *Brown*, 422 U.S. at 601-02, 45 L. Ed. 2d at 426, 95 S. Ct. at 2260-61.

The Supreme Court again drew the distinction between the interests served by the fourth and fifth amendments in *Oregon v. Elstad*, 470 U.S. 298, 306, 84 L. Ed. 2d 222, 230, 105 S. Ct. 1285, 1291 (1985):

> "Where a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement in determining whether the confession may be admitted in evidence."

The same distinction between the two amendments was recognized in *People v. White*, 117 Ill. 2d 194, 223, 512 N.E.2d 677 (1987), where the court held the voluntariness of the defendant's confession was not enough to dissipate the taint of his illegal arrest.

In *Williams v. State*, 264 Ind. 664, 674, 348 N.E.2d 623, 630 (1976), the Indiana Supreme Court held the exclusionary rule warranted suppression of the defendant's statement, which followed an illegal delay in presentment. The defendant confessed after he was illegally detained for 68 hours without a probable cause hearing. Although the court assumed the police had probable cause for the arrest, it found the detention violated the defendant's fourth amendment rights based on the lengthy detention. After completing the attenuation analysis prescribed in *Brown*, the court determined the confession, even if voluntary, was obtained in violation of the fourth amendment and was inadmissible. *Williams*, 264 Ind. at 674, 348 N.E.2d at 630.

In *Black v. State*, 871 P.2d 35, 39 (Okla. Crim. App. 1994), an Oklahoma court held exclusion was an available remedy after police violated the defendant's fourth amendment rights under *McLaughlin*. The court determined an untimely probable cause hearing cannot retroactively cure its preceding unlawful detention "any more than a bad search can later be justified if it proves fruitful." *Black*, 871 P.2d at 39, citing *Wong Sun*, 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407.

In *State v. Huddleston*, 924 S.W.2d 666, 672 (Tenn. 1996), the Supreme Court of Tennessee found the police violated the defendant's fourth amendment rights under *McLaughlin* by detaining him 72 hours before he confessed. The day after he confessed, he was provided a probable cause hearing. When determining the proper remedy, the · court reviewed the history and purpose of the exclusionary rule in the context of the fourth amendment and concluded suppression was appropriate. The court said, "[v]iolations of *McLaughlin* can easily be avoided, and applying the exclusionary rule to evidence obtained as a result of the illegal detention will deter further violations." *Huddleston*, 924 S.W.2d at 673. The court applied the *Brown* attenuation factors and held the defendant's statement should have been suppressed.

The court specifically rejected the voluntariness test as the proper analysis for suppression in these cases.

> "The voluntariness test is designed to protect the Fifth Amendment right against self-incrimination by excluding a statement that is obtained as a result of coercion by law enforcement officials. [Citation.] It does not address the interests implicated by a Fourth Amendment violation." *Huddleston*, 924 S.W.2d at 673-74.

The United States Court of Appeals for the Ninth Circuit dealt

with a presumptively unreasonable detention in *Anderson v. Calderon*, 232 F.3d 1053 (9th Cir. 2000). The court concluded the appropriate remedy for a *McLaughlin* violation is the exclusion of the statement—if it was found to be the fruit of the poisonous tree. *Anderson*, 232 F.3d at 1071. The court then held some statements were the product of the defendant's untainted free will, some were not. *Anderson*, 232 F.3d at 1075-77.

In *People v. Groves*, 294 Ill. App. 3d 570, 691 N.E.2d 86 (1998), the defendant contended his confession should have been suppressed because the police detained him for four days before presenting him to a judge. The court correctly observed neither the United States Supreme Court nor the Illinois Supreme Court had specified a remedy for a *McLaughlin* violation. Approving admission of the confession, the court said:

> "While there is no separate remedy for violation of the presentment rule, our supreme court has held that the delay is a factor to be considered when determining whether the confession was voluntary." *Groves*, 294 Ill. App. 3d at 577, citing *People v. House*, 141 Ill. 2d 323, 380, 566 N.E.2d 259 (1990).

In *Groves*, both the trial and appellate courts conducted a pure voluntariness analysis. The purpose and spirit of the fourth amendment were not pursued or even mentioned. In addition, the record in *Groves* contained facts not present here. The court noted the defendant's willingness to talk to the police during his detention by engaging in a "voluntary dialogue." *Groves*, 294 Ill. App. 3d at 578. He made several brief statements during the continuing interrogation, and the court observed there was no need to interrupt the interrogation so long as the defendant was willing to talk. *Groves*, 294 Ill. App. 3d at 577-79. We have none of that in this case. This defendant was placed in a cell and kept there, virtually ignored, except for a visit to the polygraph examiner. The record is barren of any good reason why defendant was not taken before a judge. Should *Groves* be read to require only a fifth amendment voluntariness analysis under these circumstances, we decline to follow it.

We do not find *House* requires us to apply the pure voluntariness test to *McLaughlin* violations. In *House*, the Illinois Supreme Court was not faced with a fourth amendment violation. The defendant did not raise the issue. Instead, the defendant relied strictly on his fifth amendment rights and contended the delay between his arrest and probable cause hearing rendered his confession involuntary. *House*, 141 Ill. 2d at 370. Additionally, the defendant made the incriminating statements 37 hours after his arrest. At the time of his statement, the delay was presumably reasonable under *McLaughlin*. See *House*, 141 Ill. 2d at 380.

When the United States Court of Appeals for the Fifth Circuit was asked to remedy a *McLaughlin* violation, the court turned to federal statutes and Federal Rule of Criminal Procedure 5(a). *United States v. Perez-Bustamante*, 963 F.2d 48, 51 (5th Cir. 1992). Rule 5(a), like the holding in *Gerstein*, required law enforcement officials to present an arrested person before a magistrate without unnecessary delay. *Perez-Bustamante*, 963 F.2d at 51. The court focused on 18 U.S.C. § 3501 (1988) to determine whether a delay "for Rule 5(a) purposes" rendered a pre-presentment confession inadmissible. *Perez-Bustamante*, 936 F.2d at 51.

Section 3501 provided in part:

> " 'In any criminal prosecution brought by the United States ... a confession ... shall be admissible in evidence if it is voluntarily given.' " *Perez-Bustamante*, 963 F.2d at 51, quoting 18 U.S.C. § 3501(a) (1988).

Under this section, a judge could consider the delay between arrest and arraignment as one factor when determining whether a confession was voluntary. *Perez-Bustamante*, 963 F.2d at 51. The court concluded Rule 5(a) addressed the concern voiced by the Supreme Court in *Gerstein* and *McLaughlin*, and section 3501 (18 U.S.C. § 3501 (1988)) "focus[ed] on voluntariness and addressed the concern that a conviction be based on reliable evidence." *Perez-Bustamante*, 963 F.2d at 53. Applying a strict voluntariness analysis, the court held the 60-hour delay before the defendant's arraignment did not render the defendant's confession involuntary; therefore, it was admissible. *Perez-Bustamante*, 963 F.2d at 53-54.

In *State v. Tucker*, 137 N.J. 259, 274, 645 A.2d 111, 119 (1994), the Supreme Court of New Jersey followed *Perez-Bustamante* and, based on the voluntariness test, held *McLaughlin* did not require the court to suppress the defendant's confession despite a 72-hour detention between arrest and the probable cause hearing. *Tucker*, 137 N.J. at 274, 645 A.2d at 119.

We decline to follow the approach adopted in *Groves*, *Perez-Bustamante*, and *Tucker*. These cases did not address the different purposes served by the exclusionary rule under the fourth and fifth amendments.

█ The exclusionary rule cannot adequately deter police from violating fourth amendment rights if its application is limited to involuntary statements. Under the voluntariness approach used in *Groves*, *Perez-Bustamante*, and *Tucker*, the exclusionary rule holds police accountable for the treatment a suspect receives during an illegal detention, but does nothing to deter them from illegally detaining a suspect in the first place. The approach creates no incentive to comply with *McLaughlin* and *Gerstein*.

We are persuaded the decisions we have cited require us to maintain a distinction between the interests served by the fourth and fifth amendments. We deal with the kind of unlawful detention held unlawful in *McLaughlin*. This is a fourth amendment issue. If we were to say there is no remedy for violation of it, we would be doing exactly what the courts in *Dunaway v. New York* and *People v. White* said we cannot do—allow law enforcement officers to violate the fourth amendment with impunity, "safe in the knowledge that they could wash their hands in the 'procedural safeguards' of the Fifth." *Dunaway v. New York*, 442 U.S. 200, 219, 60 L. Ed. 2d 824, 840, 99 S. Ct. 2248, 2260 (1979); *White*, 117 Ill. 2d at 223.

The deterrent purpose of the exclusionary rule would be well served by suppression of statements that are unpurged of the primary taint created by a *McLaughlin* violation. Suppression would discourage police officers from parking an arrestee in a jail cell for more than 48 hours without good reason. It would deprive them of any benefit gained by their violation of the fourth amendment's guarantee that it will "furnish meaningful protection from unfounded interference with liberty." *Gerstein*, 420 U.S. at 114, 43 L. Ed. 2d at 65, 95 S. Ct. at 863.

Having said that, we now must decide whether defendant's confession is " 'sufficiently an act of free will to purge the primary taint of the unlawful invasion.' " *Brown*, 422 U.S. at 598, 45 L. Ed. 2d at 424, 95 S. Ct. at 2259, quoting *Wong Sun*, 371 U.S. at 486, 9 L. Ed. 2d at 486, 83 S. Ct. at 416.

IV. Attenuation Analysis

In *Brown*, the Supreme Court acknowledged a confession following an illegal arrest may be credited to the defendant's free will rather than illegal police activity. *Brown*, 422 U.S. at 603, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261. The court set forth four factors to determine whether a confession should be suppressed as fruit of the poisonous tree: (1) whether the confessor received the *Miranda* warnings; (2) the presence of intervening circumstances; (3) the temporal proximity of the arrest and the confession; and (4) the purpose and flagrancy of the police misconduct. *Brown*, 422 U.S. at 603-04, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261-62. Under this analysis, the voluntariness of the statement is only a threshold requirement, with the burden of establishing admissibility, by clear and convincing evidence, falling upon the prosecution. *Ollie*, 333 Ill. App. 3d at 985; *People v. Jennings*, 296 Ill. App. 3d 761, 764, 695 N.E.2d 1303 (1998); *People v. Turner*, 259 Ill. App. 3d 979, 992, 631 N.E.2d 1236 (1994). Two of these factors—the flagrancy of police misconduct and the presence or absence of intervening circumstances—"have emerged as the key factors in determining

whether a statement obtained subsequent to an illegal arrest is sufficiently purged of that arrest to be admissible." *Ollie*, 333 Ill. App. 3d at 986.

■ The record in this case contains sufficient information to conduct an attenuation analysis and remand on this issue is unnecessary.

## A. *Presence of Miranda warnings*

The record includes the *Miranda* waiver defendant signed on July 16, 1999, before giving his statement. The waiver was the second one defendant signed during the 73 hours preceding his confession. Although this factor supports admission of defendant's confession, the fact defendant received *Miranda* warnings, "alone and *per se*, cannot dissipate the taint" of an illegal detention. *White*, 117 Ill. 2d at 223; *Brown*, 422 U.S. at 603, 45 L. Ed. 2d at 427, 95 S. Ct. at 2261; *Ollie*, 333 Ill. App. 3d at 986 (the giving of *Miranda* warnings weighs in favor of attenuation; however, the warnings alone are not enough to purge the taint of a defendant's illegal arrest); *People v. Franklin*, 115 Ill. 2d 328, 337, 504 N.E.2d 80 (1987) (receiving *Miranda* warnings "on several occasions" during detention was not enough to purge the taint); *Huddleston*, 924 S.W.2d at 675 (*Miranda* warnings "indicat[ed] that the defendant was aware of his Fifth Amendment rights against self-incrimination which is a threshold factor").

## B. *Presence of intervening circumstances*

An intervening circumstance purges the taint of illegality by breaking the causal connection between illegal police conduct and the confession. *People v. Austin*, 293 Ill. App. 3d 784, 788, 688 N.E.2d 740 (1997). Our analysis of this factor focuses on the events occurring during defendant's preconfession detention and whether any event broke the causal connection between the start of defendant's illegal detention and his statement.

During that time, defendant was not confronted with any new evidence, he never used the telephone, and he did not speak with an attorney. The only event occurring during the delay before presentment was defendant's polygraph examination, which occurred at 4:45 p.m. on July 15, 1999—more than 48 hours after his arrest. Absent any emergency or extraordinary circumstance at that time, the detention already was illegal under *McLaughlin* when defendant completed the examination.

A polygraph examination occurring during an illegal detention is also a form of interrogation and does not constitute an intervening circumstance. *Franklin*, 115 Ill. 2d at 334 (the defendant's willingness

to submit to a polygraph cannot alone operate to purge the taint of an illegal arrest and detention. "Moreover, the polygraph examination was conducted as a consequence of the illegal detention, and the results themselves were therefore tainted").

The same is true in this case. Defendant's polygraph examination occurred after the delay transformed into an illegal detention under *McLaughlin*. As fruits of the detention, neither the polygraph examination nor its results broke the causal connection between the illegal police conduct and defendant's confession. Nothing else happened, other than the casual police search for witnesses, known and unknown. This factor supports suppression.

C. *Temporal proximity*

The Illinois Supreme Court has described this factor as "ambiguous"; its significance depends on the particular circumstances of the case. *White*, 117 Ill. 2d at 224. Rather than dissipating the taint of illegality, an illegal detention can be an ongoing violation with "cumulative" effects. *Franklin*, 115 Ill. 2d at 335. For example, a prolonged detention between an arrest and a confession " 'may serve to amplify the coercion latent in a custodial setting.' " *Ollie*, 333 Ill. App. 3d at 985, quoting *People v. Lekas*, 155 Ill. App. 3d 391, 414, 508 N.E.2d 221 (1987); *White*, 117 Ill. 2d at 224 (where there are no relevant intervening circumstances, a prolonged illegal detention "may well be a more serious exploitation of an illegal arrest than a short one" and "a long and illegal detention may in itself impel the defendant to confess"); *Huddleston*, 924 S.W.2d at 675 ("[W]hen the detention becomes unlawful under *McLaughlin*, the passage of time actually makes the violation worse. *** Once the detention becomes unlawful, the pressure to confess likely increases with each moment of continuing illegal detention").

There can be intervening circumstances that serve to purge a defendant's confession of the taint of his illegal arrest. *Turner*, 259 Ill. App. 3d at 993. For example, the defendant might be confronted with new, legally obtained information that would produce a voluntary desire to confess. *Ollie*, 333 Ill. App. 3d at 986. Nothing like that happened in this case.

We find no intervening circumstances to explain defendant's decision to confess after twice denying involvement, which leads us to believe the inherently coercive nature of the 73-hour detention produced a confession that was not sufficiently an act of free will, purged of primary taint.

D. *Purpose and flagrancy of official misconduct*

The purpose and flagrancy of police misconduct is a key factor in

determining whether this evidence is admissible (*Ollie*, 333 Ill. App. 3d at 986). In this case, the factor supports suppression. The police detained defendant without a probable cause hearing for 73 hours until he gave an inculpatory statement. With defendant's confession in hand, police presented defendant before a judge early the next morning. Although the police maintained they had to round up the witnesses before the State's Attorney could file formal charges against defendant, this reason hardly qualifies as an emergency or extraordinary circumstance that would justify the violation of defendant's constitutional rights under the fourth amendment.

The Supreme Court in *Gerstein* and *McLaughlin* created a rule of prompt presentment to safeguard the rights of innocent persons, whose rights may never be litigated, from receiving unconstitutional treatment at the hands of police. The delay tactics used by the police in this case serve to create the situation the court sought to prevent. The court said, "the police should make every attempt to minimize the time a presumptively innocent individual spends in jail." *McLaughlin*, 500 U.S. at 58, 114 L. Ed. 2d at 64, 111 S. Ct. at 1670. The record fails to show any attempt by the police in this case to minimize the length of defendant's detention. On the contrary, the record demonstrates a studied indifference to defendant's jail cell presence.

*McLaughlin* was decided more than 12 years ago. Its mandate should come as no surprise to police. Compliance is easy. All police are required to do is promptly present a suspect for a probable cause hearing. Here, the police ignored the rule and waited. Finally, after 73 hours of waiting, defendant gave the inculpatory statement to police even though he had repeatedly denied involvement in the crime.

Perhaps most telling is the detective's testimony that police held defendant "pending further investigation." This admission and the nature of defendant's detention suggest the purpose was to elicit a statement through exploitation of the illegality. The wilful disregard of *McLaughlin* in this case weighs heavily in favor of suppression.

CONCLUSION

The failure to suppress defendant's confession was reversible error. Because the remaining evidence is not sufficient to support a conviction, and because defendant now has served the sentence imposed on him, we reverse his conviction without remand.

Reversed.

SOUTH and HALL, JJ., concur.