THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ADELA CASTANEDA, Defendant-Appellant.

Fourth District   No. 4—97—0872

Opinion filed October 20, 1998.

Daniel D. Yuhas and John M. McCarthy, both of State Appellate Defender's Office, of Springfield, for appellant.

Michael D. Clary, State's Attorney, of Danville (Norbert J. Goetten, Robert J. Biderman, and Timothy J. Londrigan, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE GARMAN delivered the opinion of the court:

Defendant Adela Castaneda was convicted following a jury trial in the circuit court of Vermilion County of one count of unlawful posses-

sion of a controlled substance with the intent to deliver (720 ILCS 570/401(a)(2)(C) (West 1996)), one count of unlawful delivery of a controlled substance (720 ILCS 570/401(a)(2)(A) (West 1996)), and two counts of criminal drug conspiracy (720 ILCS 570/405.1(a) (West 1996)). On December 24, 1997, she was sentenced to concurrent terms of 12 years' imprisonment on each of the possession charges and 6 years' imprisonment on each of the conspiracy charges. She argues on appeal that she was denied a fair trial when the prosecutor argued to the jury members that they had a duty to convict her. She argues, in addition, that she cannot be convicted of the inchoate crime of conspiracy when she was also convicted of the underlying principal offense. We agree.

## CONSPIRACY CONVICTIONS

■ We first address defendant's second issue. She argues, and the State concedes, that a person may not be convicted of both an inchoate offense and the underlying principal offense. 720 ILCS 5/8—5 (West 1996). She may raise this issue on appeal, despite not having made the argument to the trial court, because the plain error rule applies. *People v. Sonntag*, 238 Ill. App. 3d 854, 857, 605 N.E.2d 1064, 1066 (1992).

■ It was error for the trial court to enter convictions and impose sentence on the conspiracy counts because the defendant was also convicted of the underlying principal offenses. We, therefore, vacate the convictions on the two counts of criminal drug conspiracy. However, as defendant and the State agree, if this is the only relief provided by this court, a resentencing hearing is not necessary. We, therefore, turn to the facts of the case.

## FACTS

Vermilion County sheriff's department investigator Rod Kaag was contacted by Jose Colunga on February 4, 1997. Colunga, an informant, told Kaag that a large quantity of cocaine was about to be brought to a Hoopeston address by some people from Chicago. Kaag and other agents set up surveillance of the address given by Colunga. Colunga contacted Kaag a second time and told him that the drugs had arrived and that the people in the house needed scales to weigh the cocaine to repackage it for distribution. The police then arranged for Colunga to make a controlled purchase at the residence.

Kaag testified that while the officers watched the outside of the house, Colunga went inside carrying $300 in currency that had been photocopied for identification. When he left the house, he no longer had the money, but he was carrying a substance that field-tested positive for cocaine. Kaag obtained a search warrant for the house where

defendant lived with her husband, Jose Mario Castaneda (Mario), and their children. Defendant, who is the sister of Colunga's wife, Sally, was inside the house when Colunga made the purchase. Mario arrived just prior to the execution of the search warrant. The police found four other adults and three children inside.

Jose Colunga testified that he had assisted the police on several occasions, in the hope that he could avoid going to prison on a pending marijuana charge. His wife told him that her sister, the defendant, told her that there "was going to be some stuff coming down" from Chicago. When he was preparing to enter the house to make the controlled purchase, he was given $300 to purchase one-quarter ounce of cocaine. He testified that Estrella, one of the visitors from Chicago, quoted him the price. Later, he said he knew the price, "Cause that's what the prices are in Hoopeston." After the defendant opened the door for him, he told her that he had come to talk to Estrella about buying some cocaine. Defendant told him that "they couldn't do anything because they didn't have scales." Colunga said that he brought scales. Then he, Estrella, and one of the men went into the bedroom with the scales and closed the door. Once in the bedroom, he saw a "[b]ig package of cocaine." He paid Estrella $300 for some cocaine that was cut from the big package and weighed on the scales. While these three were in the bedroom, the defendant was in the dining room "watching the doors so the kids won't get in." When he left, defendant was in the dining room or the kitchen.

On cross-examination, Colunga stated that defendant quoted him a price of $900 per ounce during a telephone conversation. On redirect, he explained that this conversation took place about an hour before he went to make the purchase. He said that his wife spoke to defendant on the phone. Then, he said that he actually spoke to defendant. Finally, on recross-examination, he stated that defendant called him looking for scales and that he asked her the price per ounce. She responded that it was $900. Both he and his wife talked to defendant during the call.

Estrella was arrested that night and had the $300 in her possession. Defendant was arrested at her sister's home on April 1, 1997.

Illinois State Police special agent Gregory Dixon testified that he spoke with the defendant after her arrest. After he informed defendant of her rights, she signed a waiver and agreed to the interview. Defendant told him that in late January, she and her husband had some visitors from Chicago. One of them, Estrella, brought one-half kilogram of cocaine and tried, unsuccessfully, to sell it in Hoopeston. When the visitors got ready to leave, their car would not start. Defendant and her husband agreed to sell their car to them for $4,000, with

a $2,000 down payment. The visitors left in the car, with the promise to return in several days with the $2,000 balance.

Defendant came home on February 4, 1997, to find Estrella and her friends there. Estrella retrieved a blanket from the car and "made some kind of gesture that led [defendant] to believe that the blanket contained [ ] cocaine." Estrella took the blanket into the back bedroom. At approximately 8 p.m., Colunga called and asked for Mario. Colunga wanted to know if the cocaine had arrived. Defendant told him her husband was at work and that Colunga would have to talk to Mario. Colunga arrived a bit later to buy $300 worth of cocaine. He and Estrella went into the back bedroom. Defendant saw Estrella putting $300 in her vest pocket as Colunga was leaving.

Dixon testified that defendant indicated no surprise that cocaine was brought into her home on either occasion. She did not indicate that she had made any effort to get the cocaine out of her house. She was aware of the transaction with Colunga as it was taking place. It was Dixon's opinion that defendant's husband was "doing a lot of the actual dealing," but that defendant assisted him by "fielding phone calls," for example.

At the conclusion of the State's closing argument, the prosecutor said:

> "Your oath requires you to find the correct verdict on this evidence and on the law ***. I would suggest your oath requires you to find the Defendant guilty on all of the charges.
>
> You people came in here yesterday *** and you took on a duty just like the Judge *** when he became a judge, I took on one, [and] [the assistant Attorney General] took on one when we became prosecutors and [defense attorney] took on one when he became a defense lawyer. Your duty is you are part of the system ***. When a jury comes into a courtroom and has evidence like this presented to it and it is unrebutted evidence, it is not living up to your oath, you are not doing your duty if you let her walk out of here."

Defense counsel objected and the trial court overruled the objection. The prosecutor then concluded:

> "Because on the evidence you have heard you will not be living up to your duty to the system, to the People of the State of Illinois[,] if this type of evidence lets someone walk out of the courtroom."

Defendant's posttrial motion raised the issue of improper closing argument, specifically the prosecutor's remarks regarding the duty of the jurors to convict. The motion was denied on September 12, 1997, and sentence was imposed.

## PROSECUTORIAL MISCONDUCT

Defendant argues on appeal that the prosecutor's remarks to the

jurors on their duty were improper and, because of those remarks and because the trial court erred by overruling her objection, she was denied a fair trial.

■ Although attorneys are allowed latitude in closing arguments, reversible error results when comments by a prosecutor "engender substantial prejudice against a defendant [citation], such that it is impossible to say whether or not a verdict of guilt resulted from those comments." *People v. Henderson*, 142 Ill. 2d 258, 323, 568 N.E.2d 1234, 1265 (1990). The State argues that the comments were not improper, that they:

> "do not suggest a duty to convict but rather a duty to review the evidence, apply it to the law given the jury by the court, and reach the inescapable conclusion that the law required the conviction of defendant under these facts."

Defendant cites two cases from other jurisdictions and one United States Supreme Court case in support of her argument that it is improper for a prosecutor to argue to a jury that failure to convict is a failure to do its duty.

In *New Jersey v. Pennington*, 119 N.J. 547, 575 A.2d 816 (1990), the Supreme Court of New Jersey reversed a conviction on other grounds and, then, in *dicta*, discussed the allegations of prosecutorial misconduct because the court had concluded that "the prosecutor, if he did not cross the line of impropriety, came perilously close to committing reversible error." *Pennington*, 119 N.J. at 565, 575 A.2d at 824. One of the six separate instances of prosecutorial misconduct discussed was the making of "remarks implying that jurors will violate their oaths if they fail to convict," which the court found "improper." *Pennington*, 119 N.J. at 576, 575 A.2d at 831. The court concluded:

> "Although the prosecution in a criminal case may use forceful language in summing up the State's case [citation], it may not, as here, explicitly tell the jurors that they are obligated by their oath to return a particular verdict." *Pennington*, 119 N.J. at 576, 575 A.2d at 831.

The prosecutor in *Pennington* asked the jury to " 'live up to your oath and apply [the] law' " (*Pennington*, 119 N.J. at 575, 575 A.2d at 831) and to " 'return the verdict that's called for *by your oath*, by the law, [and] by the evidence' " (emphasis in original) (*Pennington*, 119 N.J. at 575, 575 A.2d at 831).

In *Redish v. State of Florida*, 525 So. 2d 928, 930 (Fla. Dist. Ct. App. 1988), the Florida court reversed and remanded where the prosecutor had made repeated improper comments during closing argument. One of the four comments objected to at trial by the defendant was the statement, " 'Gentlemen, if you succumb to the defense

argument, you would be in violation of your oath of jurors.' " *Redish*, 525 So. 2d at 929. The trial court sustained the objection and instructed the jury to disregard it. Nevertheless, on appeal, the court found this, and another comment made by the State, to be "improper and sufficiently prejudicial to constitute reversible error." *Redish*, 525 So. 2d at 930. The quoted comment was "an impermissible attempt by the prosecution to instruct the jury as to its duties and functions." *Redish*, 525 So. 2d at 930.

Both *Pennington* and *Redish* relied on the decision of the United States Supreme Court in *United States v. Young*, 470 U.S. 1, 84 L. Ed. 2d 1, 105 S. Ct. 1038 (1985), also cited by defendant. In *Young*, the Court held that it was "inappropriate and amount[ed] to error" for a prosecutor to argue during closing argument that the jury would not be doing its job if it did not convict the defendant. *Young*, 470 U.S. at 16, 84 L. Ed. 2d at 13, 105 S. Ct. at 1047. The majority found that reversal was not necessary, however, because the defendant did not object at trial and defense counsel's own inappropriate remarks invited the prosecutor to respond in kind. *Young*, 470 U.S. at 17-18, 84 L. Ed. 2d at 14, 105 S. Ct. at 1047-48.

It is clear in this case that the prosecutor's remarks were inappropriate. Unlike in *Young*, however, the defendant in this case made the proper objection at trial and it was overruled. Defendant argues that reversal is required. The State urges this court to engage in harmless error analysis.

Defendant cites the recent discussion of the supreme court in *People v. Kidd*, 175 Ill. 2d 1, 50-51, 675 N.E.2d 910, 934 (1996), in support of her contention that the trial court committed reversible error by overruling her objection. In *Kidd*, the prosecutor argued to the jury at the sentencing phase in a capital murder trial that defense evidence regarding the effect on defendant of his father's execution was " 'the excuse that they want to utilize for you to abrogate your oath.' " *Kidd*, 175 Ill. 2d at 51, 675 N.E.2d at 934. The trial court sustained the defendant's objection and instructed the jury to disregard this comment. The supreme court held "that the trial judge's prompt action in sustaining the defendant's objection was sufficient to cure any prejudice the comment might otherwise have engendered." *Kidd*, 175 Ill. 2d at 51, 675 N.E.2d at 934.

*Kidd*, thus, stands for the proposition that the trial court can cure the error of improper argument by sustaining a timely objection and properly instructing the jury. Defendant cites the special concurrence, which calls for such prosecutorial misconduct to be "strongly condemned" by the court. *Kidd*, 175 Ill. 2d at 57, 675 N.E.2d at 937 (McMorrow, J., specially concurring, joined by Freeman, J.). The

implication that the jurors "would be *violating their oaths*" (emphasis in original) (*Kidd*, 175 Ill. 2d at 58, 675 N.E.2d at 937 (McMorrow, J., specially concurring, joined by Freeman, J.)) is, according to the concurring opinion:

> "[A] misstatement of the law [that] cannot be lightly glossed over as inadvertent or insignificant. In my opinion, merely holding that any error was cured by the trial court's sustaining the defense objection to the remark does not adequately dispose of the issue." *Kidd*, 175 Ill. 2d at 58, 675 N.E.2d at 937 (McMorrow, J., specially concurring, joined by Freeman, J.).

The concurrence concluded that "the conduct described herein borders on constituting reversible error." *Kidd*, 175 Ill. 2d at 59, 675 N.E.2d at 937 (McMorrow, J., specially concurring, joined by Freeman, J.).

We decline to hold that it is reversible error *per se* when a trial court fails to properly rule on defendant's timely objection to improper argument. We are persuaded by the language of *Young*:

> "Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding. Instead, *** the remarks must be examined within the context of the trial to determine whether the prosecutor's behavior amounted to prejudicial error. In other words, the Court must consider the probable effect the [remarks] would have on the jury's ability to judge the evidence fairly." *Young*, 470 U.S. at 11-12, 84 L. Ed. 2d at 10, 105 S. Ct. at 1044.

## HARMLESS ERROR ANALYSIS

■ The State argues that harmless error analysis is required. We agree and, thus, turn to the record to determine if it is "impossible to say whether or not a verdict of guilt resulted from those comments." *Henderson*, 142 Ill. 2d at 323, 568 N.E.2d at 1265. Error is harmless if, "had the error not been committed, the defendant still would not have been entitled to prevail." *People v. Fomond*, 273 Ill. App. 3d 1053, 1064, 652 N.E.2d 1322, 1330 (1995). The standard of review applied to prosecutorial comments is whether "the evidence of his guilt was substantial and was not closely balanced." *Henderson*, 142 Ill. 2d at 323, 568 N.E.2d at 1265.

■ The State argued that defendant was guilty of delivery of cocaine and possession of cocaine with intent to deliver based on a theory of accountability. A person is legally accountable for the conduct of another when:

> "Either before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 1996).

At trial, the State argued that defendant provided her visitors with several types of aid, with the intent to help them deliver cocaine: she permitted them to use her home; she quoted a price to a potential buyer; she admitted the buyer into her home, knowing that he was there to buy drugs; she facilitated the sale by helping to obtain a scale; she acted as a lookout during the transaction; and she fielded phone calls for the operation. The State also argued that she and her visitors jointly possessed the cocaine.

Defendant admitted to special agent Dixon that she was aware of the presence of cocaine in her home and of her visitors' intention to sell the drugs in Hoopeston. This falls short of proving that she permitted them to use her home with the intent of promoting or facilitating their illegal conduct.

Kaag testified that Colunga "told me what [defendant] had stated the prices would be," specifically, $1,000 an ounce or $300 for one-quarter ounce of cocaine. Later, he testified that Colunga did not tell him whether he got this information from defendant or from someone else. Colunga himself offered several different explanations for his knowledge of the $300 price for one-quarter ounce of cocaine. On direct examination, when asked how he knew how much money to bring for the buy, he said, "I don't know. I think one of the ladies told me, quoted me." When asked which lady, he replied, "Estrella." The prosecutor asked again, "How did you know the prices when you talked to [Kaag] on the phone?" The following exchange then took place:

"A. She had told me that already.

Q. Who had?

A. Estrella.

Q. When?

A. Earlier that day."

Not content with these answers, the prosecutor later returned to the subject:

"Q. Why [did the police give you] $300?

A. Cause I was supposed to get a quarter ounce for them.

Q. Okay. At this time had you talked to Estrella on that day?

A. No.

Q. So how did you know a quarter ounce was $300?

A. Cause that's what the prices are in Hoopeston."

On cross-examination, Colunga said that defendant quoted a price of $900 per ounce over the phone. He was not asked whether he spoke to her directly. He was not asked how he knew that one-quarter ounce would be $300, if an ounce cost $900. Nor was he asked to explain the discrepancy between this statement and the $1,000 price he quoted to Kaag.

Finally, on redirect, Colunga was questioned again about the price:
"Q. You said you talked to [defendant] on the phone once, she quoted you a price, about $900 an ounce from the Chicago people, right?
A. (Affirmative nod given.)
* * *
Q. And did you actually talk[ ] to [defendant] at that time?
A. My wife did.
Q. Didn't you just say before that [defendant] told you the 900?
A. Yeah.
Q. So she did, didn't she?
A. Yeah.
Q. So you talked to her?
A. Right."

It is not certain that Colunga spoke directly to defendant about the price of cocaine. Further, if they did speak, there was no testimony about the conversation itself from which to determine whether she spoke as a seller quoting a price or as one who also knew "what the prices are in Hoopeston." The only detail of the alleged conversation acknowledged by Colunga was that defendant told him the price was $900 per ounce. This is not consistent with his statement to Kaag. There is, thus, some evidence, but not substantial evidence, that defendant quoted drug prices to Colunga with the intent to facilitate a sale.

The State also argues that defendant aided the drug dealers by knowingly admitting Colunga into her home for the purpose of buying drugs. Further, the State points to Colunga's testimony on redirect when he answered, "No," when asked if the people from Chicago would have sold to him if defendant had not asked him into the house. As the State suggested in its closing argument, he may have meant that the people from Chicago would not sell to anyone unless someone known to them, such as defendant, vouched for the buyer. He may have meant that the transaction could not have taken place if he had not been able to gain entrance to the house. If a police informant had gained entrance to the home of a mere acquaintance for the purpose of buying cocaine, the testimony on this point would have greater weight. Defendant and Colunga, however, are related as in-laws. Thus, it is not particularly significant that she readily allowed him into her home.

Kaag also testified that when he spoke to Colunga by telephone the second time on February 4, 1997, Colunga told him that "they *** were attempting to locate scales so they could weigh the cocaine down for distribution." He did not indicate whether "they" referred to the

three visitors from Chicago or to all of the adults in the house, including defendant. Later, Kaag testified that Colunga told him that Mario was out trying to find scales. Kaag was not certain whether Colunga said that defendant was also looking for scales.

Colunga testified that when he went to the door of defendant's house and told her that he was there to "talk to Estrella," defendant "stated they couldn't do anything because they didn't have scales." He told her that he had brought some with him. It would have been helpful if Colunga had been asked to quote defendant's exact words. Did she say, "*We* can't do anything because *we* don't have scales?" or "*They* can't do anything?" Again, it is unclear whether she was actively aiding the drug dealers and should be held accountable, or whether she was merely tolerating their presence in her home because of her husband's involvement. At the very end of his testimony, Colunga did state that he spoke directly with defendant on the telephone and that she was looking for scales. The testimony regarding the scales is suggestive of defendant's guilt but not overwhelming.

The State also asserts that defendant acted as a "lookout" during the drug transaction, which took place in a bedroom of her home with the door closed, while she was either in the dining room or the kitchen. The only testimony on this point was Colunga's conclusory statement that defendant watched the door so that her children would not get into the bedroom. If she was, in fact, merely trying to shield her children from the conduct of other adults in her home, this is equivocal evidence of aiding and abetting the drug dealers.

Defendant cooperated with special agent Dixon, admitting that she was aware on both occasions when cocaine was brought into her home by persons intending to sell it in Hoopeston. According to Dixon, defendant said that Colunga called on February 4, 1997, inquiring about the arrival of the cocaine, and defendant told him that he would have to speak to Mario, who was at work. This contradicts Colunga's version of the phone call. Dixon testified that he was "confident that she had knowledge of the cocaine being in her residence." This much she admitted. It was Dixon's "opinion that, um, she was—she was, um, assisting, um, with fielding phone calls." There is little evidence, however, other than Dixon's opinion, that defendant took orders or arranged for delivery of drugs over the telephone.

The final basis argued for defendant's guilt is that she, jointly with the dealers from Chicago, possessed one-half kilogram of cocaine. The State argued constructive possession at length in closing but does not discuss this issue in its brief. The evidence showed that Estrella, on two occasions, brought a quantity of cocaine into defendant's home, either under her clothing or wrapped in a blanket. Estrella made no

secret of the fact that she was carrying cocaine. Defendant was aware of its presence and did nothing to try to prevent Estrella from bringing it into her home. There was no evidence that defendant ever saw or touched the cocaine or that she asserted any control over it.

■ The State did present some evidence in support of each of its claims that defendant aided and abetted in the possession and delivery of cocaine. However, the evidence on each point was equivocal. Considering all of the facts and circumstances, the evidence of defendant's guilt is not overwhelming. The questions that we must answer are whether the evidence of guilt is substantial and whether it is closely balanced. We find the evidence that defendant aided or is otherwise accountable for the actions of Estrella and others is less than substantial and that it is indeed closely balanced. Because of this, the prosecutor's improper remarks to the jury members that it was their duty to convict defendant might well have tipped the scales in the State's favor. This, unless corrected during trial, constitutes reversible error.

Citing the decision of this court in *People v. Perkins*, 247 Ill. App. 3d 778, 786, 617 N.E.2d 903, 909 (1993), the State also argues that any error was negated by the trial court's proper instruction on the law applicable to closing argument:

> " 'Closing arguments are made by the attorneys to discuss the facts and circumstances in the case, and should be confined to the evidence and to reasonable inferences to be drawn from the evidence. Neither opening statements nor closing arguments are evidence, and any statement or argument made by the attorneys which is not based on the evidence should be disregarded.' "

See Illinois Pattern Jury Instructions, Criminal, No. 1.03 (3d ed. 1992). At issue in *Perkins* were two "inflammatory remarks" made by the prosecutor during closing argument. *Perkins*, 247 Ill. App. 3d at 785, 617 N.E.2d at 908. The defendant objected to the first remark at trial. The trial court did not sustain the objection but "instructed the prosecutor to '[j]ust argue the facts.' " *Perkins*, 247 Ill. App. 3d at 786, 617 N.E.2d at 908. Defendant did not object to the second remark, thus waiving consideration on appeal. We noted, "Any error resulting from the prosecutor's comments is usually cured when the trial court sustains [an] objection or admonishes the jury." *Perkins*, 247 Ill. App. 3d at 786, 617 N.E.2d at 908. In *Perkins*, in addition to admonishing the prosecutor to limit his remarks to the facts, the trial court instructed the jury that " '[n]either sympathy nor prejudice should influence you,' " as well as delivering the instruction quoted above. *Perkins*, 247 Ill. App. 3d at 786, 617 N.E.2d at 909.

In the present case, unlike in *Perkins*, the trial court overruled the

defendant's objection, did not instruct the prosecutor to limit his remarks to the facts, and did not make specific reference in its instructions to the prosecutor's improper remarks regarding the duty of jurors.

The jury instructions in this case were insufficient to cure the error caused by the improper remarks and the overruling of defendant's objection.

## CONCLUSION

We conclude that the inappropriate remarks of the prosecutor during closing argument and the failure of the trial court to sustain defendant's objection and properly admonish the jury may have influenced the verdict. We, therefore, reverse defendant's conviction and remand for a new trial.

Reversed and remanded with directions.

COOK and STEIGMANN, JJ., concur.