THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MARCEL NICHOLAS, Defendant-Appellant.

First District (5th Division)   No. 1—02—0828

Opinion filed July 9, 2004.

Michael J. Pelletier and Douglas R. Hoff, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Veronica Calderon Malavia, and Anne L. Asulin, of counsel), for the People.

JUSTICE REID delivered the opinion of the court:

Following a jury trial, Marcel Nicholas was convicted of the first degree murder of his mother. He was sentenced to 35 years in prison. Nicholas argues on appeal (1) that the trial court erred in refusing the instruct the jury on involuntary manslaughter, (2) that the prosecutor made improper arguments before the jury, and (3) that the trial court erred in denying the motion to suppress a confession that was involuntary. For the reasons that follow, we reverse and remand for a new trial.

## BACKGROUND

### Motion To Suppress

Prior to trial, Nicholas filed a motion to suppress the court-reported statement he made while in custody. There is no dispute that Nicholas was given food, drinks, and cigarettes and otherwise treated fairly by the police while in their custody. Nicholas, after having spoken with his lawyer, invoked his right to remain silent. Nonetheless, he did agree to sign a statement and indicated his willingness to speak with the police.

At the suppression hearing, Detective McNally testified that he

met Nicholas, who was not handcuffed, in an interview room in Area 1. Detective McNally provided Nicholas with water and read his rights pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Nicholas indicated that he understood those rights. After some further discussions, Detective McNally testified that Nicholas agreed to talk. According to Detective McNally, Nicholas detailed the fight he had with his mother on the morning of her death. Nicholas also indicated that he hoped the investigation would result in him getting boot camp or probation and that he was hoping for the best. Detective McNally also testified that, in a later discussion, Nicholas incriminated himself. After that statement, Nicholas was formally arrested. Nicholas continued to cooperate with the police in the investigation, indicating where the weapon might be found. No gun was recovered as described. Nicholas later consented to a search of his apartment.

In further discussions with the police, Nicholas was repeatedly read his *Miranda* rights by police officers and the assistant State's Attorney (ASA). Detective McNally also testified that later Nicholas specifically asked to speak with him and then later with the ASA. This was after Nicholas had consulted with his lawyer and invoked his right to remain silent. In speaking with Detective McNally, Nicholas admitted to lies in his previous oral statement. When speaking with the ASA, Nicholas agreed to a court-reported statement.

Nicholas claimed the statement was not voluntary. By the time he gave the statement, he had already allegedly orally confessed to the murder twice, but those confessions were not challenged. Nicholas claims the statement was coerced by threats made against him by unnamed officers. After a hearing, the trial court denied the motion and the case proceeded to trial.

## Trial

On September 24, 1999, Cheryl Foster was sitting in her living room at approximately 5:45 a.m. She was awaiting the arrival of a visiting nurse when she heard a woman scream "no," then heard three or four gunshots. Foster was unable to see anything from her window so she called 911.

Shunte Thomas, who lived near Foster, was awake at that hour nursing her baby. She heard the front door of her building open, someone yell "please don't" followed by four gunshots. There was a pause between the third and fourth gunshot. When Thomas looked out the window, she saw a woman lying in front of the building by a car. Thomas also called 911, then went downstairs to the floor below and knocked on that apartment door. William Penn, the occupant of

that apartment, answered the door and was told about the shooting. Penn and Thomas went down to the first floor to where Nicholas lived with the victim, Diane Jefferson-Nicholas. Initially, no one responded to their knocking. They were still pounding on the door when the police arrived on the scene. Various officers secured the crime scene.

Officer Ruth Singleton went into the building where Penn and Thomas were pounding on Nicholas' door. Nicholas answered the door and was told that someone had been shot outside the building. The police asked Nicholas if he knew where his mother was. Nicholas told them that his mother had just left to go to a meeting. Nicholas then stepped outside and identified the victim as his mother. She had suffered multiple gunshot wounds to the head, neck and upper chest. Nicholas attempted to go to his mother but was ordered back by the police. When the officers rejoined Nicholas in the apartment, Nicholas wondered aloud how he was going to get to work and who was going to take care of him. Officer Singleton described Nicholas as calm and unemotional. Officer Singleton followed Nicholas into his bedroom and watched him collect a pack of cigarettes and pour himself a glass of liquor. Officer Singleton suggested that Nicholas should call his relatives and tell them what had happened. Nicholas made a phone call, which led to the arrival of a family friend. Nicholas also gave the police a sheet to use to cover his mother's body. Thomas called her husband and asked him to come home. Later, Officer Singleton interviewed both Thomas and her husband and determined that they had prior business dealings with the victim.

Detectives and forensic investigators recovered four shell casings near the body. It was later determined that they came from the same gun. The police also recovered two crocheted purses in a nearby gangway. The victim's identification, money and other personal items were found in one of the purses, but they were not processed because they were contaminated when the police officers opened them. Though the victim was allegedly on her way to a meeting, her car keys were not located.

Dr. Tae Nyong An, an assistant medical examiner at the Cook County medical examiner's office, testified that he performed an autopsy. External examination revealed four entry and two exit wounds. The first bullet entered below the right nostril and exited near the left ear. Another bullet entry wound was located but no corresponding exit wound was discovered. This bullet entered on the right side of the neck and lacerated part of the victim's brain and fractured the occipital bone. Another bullet entered the chest on the upper portion of the right breast, fracturing the collarbone, thoracic vertebrae and spinal cord. Yet another bullet lacerated the heart and both lungs on its trajectory through the victim's body.

Detectives Thomas Benoit and Jean Romic spoke with Nicholas, who agreed to go to their office and help in the investigation. The detectives made arrangement for Nicholas to be transferred to the Area 1 police station. They then conducted further investigation at the coroner's office before returning to Area 1. Detectives Benoit and Romic briefly spoke with Nicholas but wanted to complete other interviews first. They took Nicholas to central police headquarters for a polygraph test at 10 p.m., then brought him back to Area 1 the next day. The interview was then turned over to Sergeant Brannigan and Detective McNally. Detective McNally had previously been assigned to canvas the area of the shooting to search for witnesses. Detective McNally noted that the garbage cans at the building had been emptied since the shooting.

Detective McNally testified that Nicholas was kept in an unlocked room until he was formally arrested, then the door was locked. Prior to his arrest, Nicholas was allowed access to the restroom so long as a police officer showed him where it was. Detective McNally read Nicholas his *Miranda* rights. Nicholas discussed the argument he had with his mother but did not incriminate himself in the shooting. Detective McNally let Nicholas use the restroom and provided him with something to drink. After further discussions, Nicholas was given a short period to rest. When the conversations resumed, Nicholas was again read his *Miranda* rights. Nicholas discussed his return to Chicago and his experiences living in his mother's house. The plan was to rehab an apartment building and allow Nicholas to live there in exchange for acting as the manager.

Detective McNally testified that Nicholas told him about the fight he had with his mother prior to the shooting. It was an argument about rent and drinking alcohol in her apartment. Nicholas told him he left the apartment through the back door. He retrieved a handgun he concealed underneath a chunk of concrete and walked around to the front of the house. Nicholas approached his mother and fired the gun at her three times in order to scare her. When his mother fell to the ground, Nicholas retraced his steps back to the apartment.

At the conclusion of the statement, Nicholas was formally placed under arrest. Once arrested, Nicholas said he had hidden the gun inside a television that was in the alley for garbage pickup. Detective McNally testified that Nicholas agreed to show them where the gun could be found. Detectives McNally and Brannigan took Nicholas back to the apartment building but were unsuccessful in searching for the gun, the television or the rock. Nicholas directed the detectives to the spot where he had his confrontation with his mother and pointed to where she had fallen. The detectives provided lunch and cigarettes for

Nicholas on the way back to the police station. Nicholas was returned to the interview room. Detective McNally testified that, after Nicholas finished eating, he was again read his *Miranda* rights. Nicholas gave Detective McNally a more detailed version of the events of the previous Thursday and Friday. Detective McNally indicated that Nicholas was insistent that he was just trying to scare his mother when he fired the gun. Nicholas then signed a consent to search the apartment. Detectives McNally and Brannigan thereafter searched the apartment but found no gun.

Assistant State's Attorney Lawrence O'Reilly also testified for the State. ASA O'Reilly first met with Detective McNally and reviewed the police reports before meeting with Nicholas. Once he was introduced to Nicholas, ASA O'Reilly claims he read Nicholas his *Miranda* rights then explained that he was not Nicholas' attorney. According to ASA O'Reilly, Nicholas told him he understood his rights from watching television. ASA O'Reilly claims, despite Nicholas' explanation of the rights, he explained the rights to him.

Nicholas explained to ASA O'Reilly that he argued with his mother about the rent. According to Nicholas, his mother told him he needed to pay rent or get out. Nicholas went out, got the gun and walked through the basement to reach the front of the building. Nicholas saw his mother walking around the passenger side of the car. He pointed the gun "in her direction" and fired it three or four times. Nicholas ran back into the house, where he claims he looked out the window and saw his mother lying on the ground next to the car. When ASA O'Reilly asked Nicholas why he shot his mother, Nicholas explained that he was hung over and angry.

ASA O'Reilly offered Nicholas the opportunity to memorialize the statement he was making. ASA O'Reilly explained that any statement could be written, dictated to a court reporter or videotaped. According to ASA O'Reilly, Nicholas chose to give a handwritten statement. The interview was moved to a different room because there was no table in the room Nicholas had been in. At around 9 p.m., before Nicholas recounted anything of substance, a police officer entered the room and informed everybody that counsel for Nicholas had arrived and wished to speak with his client. The attorney was introduced to Nicholas. ASA O'Reilly explained to Nicholas that it was his choice whether or not to speak with counsel. Nicholas agreed to talk with the lawyer so the two were left alone. When counsel was done speaking with Nicholas, he informed ASA O'Reilly that Nicholas would be invoking his right to remain silent. Nicholas repeated his desire to remain silent. ASA O'Reilly testified that he did not talk to Nicholas again that night. At trial, ASA O'Reilly did not recall if Nicholas' counsel

had been told when Nicholas would be processed and taken to the county jail. After counsel left, ASA O'Reilly documented everything that happened in his notes. In the notes, ASA O'Reilly indicated that Nicholas would be taken to court on September 27, 1999. Detective McNally never completed paperwork indicating that Nicholas would be held past call. He then asked the detectives to continue the investigation and conduct another canvas of the neighborhood around the crime scene to look for witnesses.

The next day, ASA O'Reilly checked in with Detective McNally, who told him they found no gun and no witnesses. ASA O'Reilly then went to Nicholas to make sure he was fed, provided beverages and given the opportunity to smoke, use the bathroom and sleep. Nicholas indicated that the police had treated him fairly. ASA O'Reilly asked Nicholas if he wanted to memorialize his statement. Nicholas chose to have his statement memorialized by a court reporter rather than videotaped because his hair looked terrible. According to ASA O'Reilly, once the court-reported statement was transcribed, Nicholas was given the opportunity to review the statement and make changes. Nicholas, ASA O'Reilly and Detective McNally then signed each page. According to the court-reported statement, Nicholas kept the gun in a duffel bag. He claimed he bought the gun on the street for $50 or $100. After shooting his mother, he went back in the apartment, turned off the television and got back into bed.

Once the State rested, Nicholas unsuccessfully made a motion for directed verdict. The defense then began with the testimony of Carolyn Campbell. She was leaving to go to work at the time of the shooting. Campbell's home is on the same block as the victim's apartment building. She saw an African-American male whom she did not recognize wearing an orange safety vest. Campbell admitted to having seen the defendant before and knew the man she saw was not him. Campbell did not hear gunshots or see anyone lying in the street.

Defense counsel, Donald Bertelle, next testified for the defense. Bertelle testified that he received a call indicating that a son was being charged with killing his mother. The caller asked Bertelle to represent the son, Nicholas. According to Bertelle, he called the police station, then traveled there. Bertelle was told that Nicholas was not there. That officer left, then returned and told Bertelle that Nicholas was in fact there. Bertelle indicated that he wanted to speak with Nicholas immediately but was told to have a seat and wait. After approximately 20 minutes, Bertelle was met by ASA O'Reilly. ASA O'Reilly told Bertelle that Nicholas had not given a statement. Bertelle noticed that ASA O'Reilly was carrying a sheaf of the type of paper they routinely use for the taking of custodial statements. Ber-

telle was then taken to and given a private interview with Nicholas. Nicholas invoked his right to remain silent thereafter.

Michael Kopina next testified for the defense. He is the acting section chief of the biochemistry unit at the Forensic Science Center of Chicago and is certified as an expert in the field of gunshot residue. Kopina tested the cuffs of a blue, hooded sweatshirt and concluded that both cuffs may not have been in the vicinity of a discharged firearm or primer gunshot-residue-related item. Kopina also concluded that if the cuffs had been in the vicinity of a discharged firearm, the particles were either not deposited on them, they were removed by activity or they were not detected by the tests.

Nicholas testified in his own defense. He was 22 years old and lived with his mother for a year and a half. His mother's house rules were no alcohol and no drugs in the house. She also insisted that Nicholas either be enrolled in school or gainfully employed in exchange for his living arrangements. According to Nicholas, he and his mother argued frequently. Nicholas explained that, after his mother left, he tried to sleep but heard gunshots. He ignored the pounding of his neighbors on his apartment door until the police arrived and told him his mother was dead.

Nicholas testified that he agreed to go to the police station for questioning. He was placed in a holding cell but was not handcuffed. Later, Nicholas was brought back to the police station, where he spent the night. Nicholas denied saying he killed his mother. Nicholas also testified that, early that Saturday morning, he was introduced to Detective McNally. At various times throughout the day, Nicholas spoke with Detective McNally and Sergeant Brannigan. Nicholas maintained that, when he was alone with Detective McNally, he was told of other homicide cases and told how to help himself. Nicholas indicated that Detective McNally read him his *Miranda* rights, let him smoke and provided him with beverages. Later that day, Nicholas told Detective McNally that he walked through the basement and shot his mother. Nicholas indicated that he believed that, if Detective McNally disbelieved his story, he would conclude that Nicholas was innocent and let him go. Nicholas also admitted that he lied about having gotten the gun from a former friend with whom there had been a falling out. Nicholas explained that he told the subsequent story about getting the gun on the street because he did not want to involve his former friend.

Nicholas was subsequently taken to the scene while the officers searched the area. After having fed him, the police returned him to the holding cell whereupon Nicholas gave consent to the police to search the house. Nicholas then met ASA O'Reilly and told him the

same fabricated story he told Detective McNally. He admitted he was trying to send the police on a "wild goose chase" so once they determined the story was untrue they would let him go. Nicholas testified that he was returned to the interview room, where he spent the night. Nicholas claimed that, Saturday night, two detectives threatened to "kick his ass" and to arrange for him to be "fucked in the ass" in the county jail. Nicholas testified that he became frightened and was too afraid of retaliation to tell anyone about the threats. The next morning, Nicholas agreed to give a true statement of what happened. He testified that he did not kill his mother and knew that she carried a life insurance policy to which Nicholas was the sole beneficiary.

Nicole Smith, Nicholas' girlfriend, testified that she talked to Nicholas on the phone after the shooting. Smith indicated that Nicholas was distraught. Smith also testified that she never saw Nicholas with a gun. Smith admitted that she was not with Nicholas when the shooting took place and, therefore, did not see what happened.

The jury found Nicholas guilty of first degree murder. On March 6, 2002, the trial court sentenced Nicholas to 35 years' imprisonment.

## ANALYSIS

### Trial Court Error

Nicholas argues that the trial court erred in denying his motion to suppress his custodial statements. He argues the statement was the product of psychological and mental coercion. He also argues the statement was involuntary. Nicholas argues this court should examine the totality of the circumstances surrounding the statement. He was 22 years old and never had been taken into police custody before. He was not well educated. The police allegedly threatened him with violence and an involuntary sexual act. The detention was prolonged. Nicholas argues that, once he indicated he wanted to remain silent and no longer wanted to make a written statement, he should have been transferred to county jail and brought before a judge for a probable cause determination. He argues that ASA O'Reilly and Detective McNally contradicted each other as to whose responsibility it was to have Nicholas processed. Detective McNally did not complete paperwork for holding Nicholas past call. Nicholas argues he was held in the interview room solely for the purpose of gathering additional evidence.

The State responds that the trial court properly denied the motion to suppress where Nicholas initiated further communication with the police, knowingly and intelligently waived his right to counsel and voluntarily made a court-reported statement in which he again

confessed to the murder. The State points out that Nicholas is only contesting the admissibility of his court-reported statement, not the oral statements in which he also confessed to the murder. The State points out that, contrary to Nicholas' assertion, it disputes his claim that unknown police officers made threats in the middle of the night that frightened and coerced him. The State admits it has the burden to show that the confession was voluntary.

■ "[I]n reviewing whether [defendant's] confession was voluntary, we will accord great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. However, we will review *de novo* the ultimate question of whether the confession was voluntary." *In re G.O.*, 191 Ill. 2d 37, 50 (2000). Although *In re G.O.* involved a minor, the standard of review is the same for an adult. "In determining whether a confession was voluntary, we must consider the totality of the circumstances. [Citation.] Factors to consider include the [defendant's] age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning; the legality and duration of the detention; the duration of the questioning; and any physical or mental abuse by police, including the existence of threats or promises. [Citation.] Significantly, no single factor is dispositive. [Citation.] The test of voluntariness is whether the [defendant] 'made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the [defendant's] will was overcome at the time he or she confessed.' " *G.O.*, 191 Ill. 2d at 54, quoting *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996).

■ Nicholas, a 22-year-old man, was in custody for a lengthy period of time. We recognize that his initial presence at the police station and his early participation in the investigation process were voluntary; he was in the custody of the police both before and after his formal arrest. "Custody occurs when a person's movement is restrained by force or show of authority." *People v. Willis*, 344 Ill. App. 3d 868, 875 (2003), citing *People v. Ollie*, 333 Ill. App. 3d 971, 981 (2002). "The key inquiry is whether, under the circumstances, a reasonable person would have concluded that he was not free to go about his business." *Willis*, 344 Ill. App. 3d at 875, citing *Kaupp v. Texas*, 538 U.S. 626, 629, 155 L. Ed. 2d 814, 819, 123 S. Ct. 1843, 1845 (2003), and *Ollie*, 333 Ill. App. 3d at 981. *Willis*, *Kaupp*, and *Ollie* stand for the proposition that even voluntary presence at a police station can turn into unlawful detention with the passage of time.

The record suggests that Nicholas was fed sporadically and, when he was fed donuts and fast food, it was with only a passing glance to the notion of nutrition. Additionally, over the significant period of the

custody, the record does not suggest that even the most basic arrangements were made for Nicholas to be given a blanket or pillow. Instead, if possible, he was forced to sleep on the benches or tables in the room in which he was being held.

■ At some point in the detention, a decision was made that Nicholas would be held past call. This means he would not be taken before a judge for a probable cause hearing at the earliest possible moment, which is the norm. The State's Attorney suggested that it was the responsibility of the police to process Nicholas. We note that Nicholas made his first incriminating statements fairly early in the proceedings when he was formally arrested. He was not, however, taken before a judge at that time. The United States Supreme Court has indicated that "[w]hatever procedure a State may adopt [for getting an accused before a judge or magistrate], it must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer either before or promptly after arrest." *Gerstein v. Pugh*, 420 U.S. 103, 124-25, 43 L. Ed. 2d 54, 71-72, 95 S. Ct. 854, 868-69, (1975). The *Gerstein* rule has been codified in Illinois pursuant to section 109—1(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/109—1(a) (West 1998)). Instead of taking Nicholas before a judge, the investigation was classified as ongoing when, we presume, additional evidence was to be gathered. *Willis* instructs us:

> "The Court held when police make warrantless arrests, the states must provide a probable cause determination by a judicial officer promptly after arrest. [*Gerstein v. Pugh*, 420 U.S. 103, 125, 43 L. Ed. 2d 54, 71-72, 95 S. Ct. 854, 868-69 (1975)]. The court did not define 'promptly.'
>
> In *McLaughlin*, the Court held the 'promptness requirement of *Gerstein*' requires probable cause determinations by neutral magistrates within 48 hours of warrantless arrests. [*Riverside v. McLaughlin*, 500 U.S. 44, 56, 114 L. Ed. 2d 49, 63, 111 S. Ct. 1661, 1670 (1991)]. If a suspect receives a probable cause determination within 48 hours of his arrest, a delay may still be unconstitutional if the defendant shows it was unreasonable. *McLaughlin*, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670. The Court listed 'delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake' as examples of unreasonable delays. *McLaughlin*, 500 U.S. at 56, 114 L. Ed. 2d at 63, 111 S. Ct. at 1670.
>
> If the delay is longer than 48 hours, the burden shifts to the State to show the delay was due to a 'bona fide emergency or other extraordinary circumstance.' *McLaughlin*, 500 U.S. at 57, 114 L.

Ed. 2d at 63, 111 S. Ct. at 1670." (Emphasis omitted.) *Willis,* 344 Ill. App. 3d at 877.

■ After a detailed analysis of state and federal law, the *Willis* opinion concluded as follows on the issue of what remedy was appropriate for a *McLaughlin/Gerstein* violation:

> "We are persuaded the decisions we have cited require us to maintain a distinction between the interests served by the fourth and fifth amendments. We deal with the kind of unlawful detention held unlawful in *McLaughlin.* This is a fourth amendment issue. If we were to say there is no remedy for violation of it, we would be doing exactly what the courts in *Dunaway v. New York* and *People v. White* said we cannot do—allow law enforcement officers to violate the fourth amendment with impunity, 'safe in the knowledge that they could wash their hands in the "procedural safeguards" of the Fifth.' *Dunaway v. New York,* 442 U.S. 200, 219, 60 L. Ed. 2d 824, 840, 99 S. Ct. 2248, 2260 (1979); *White,* 117 Ill. 2d at 223.
>
> The deterrent purpose of the exclusionary rule would be well served by suppression of statements that are unpurged of the primary taint created by a *McLaughlin* violation. Suppression would discourage police officers from parking an arrestee in a jail cell for more than 48 hours without good reason. It would deprive them of any benefit gained by their violation of the fourth amendment's guarantee that it will 'furnish meaningful protection from unfounded interference with liberty.' *Gerstein,* 420 U.S. at 114, 43 L. Ed. 2d at 65, 95 S. Ct. at 863.
>
> Having said that, we now must decide whether defendant's confession is ' "sufficiently an act of free will to purge the primary taint of the unlawful invasion." ' *Brown,* 422 U.S. at 598, 45 L. Ed. 2d at 424, 95 S. Ct. at 2259, quoting *Wong Sun,* 371 U.S. at 486, 9 L. Ed. 2d at 486, 83 S. Ct. at 416." *Willis,* 344 Ill. App. 3d at 884.

The decision was made to hold Nicholas past call even though he had been in contact with his lawyer, who appeared at the station and participated in Nicholas' exercise of his right to remain silent. Despite the exercise of that right, the interrogation continued until Nicholas confessed. We do not believe, under all the facts and circumstances of this case, that the confession can be considered free of the taint of the fourth amendment violation. As a result, the trial court should have suppressed the statement and any evidence flowing therefrom. Upon remand, the State will have an opportunity to try the case, this time without the statement.

## Involuntary Manslaughter

■ Nicholas next argues that the trial court erred in refusing defense counsel's request to instruct the jury on involuntary

manslaughter because there was evidence from which the jury could have found that, because he was only trying to scare his mother, he lacked the intent to kill her. He argues that, though he acted recklessly, he lacked the specific intent to kill her. Nicholas believes that, because this error turns exclusively on a question of law, it should be subject to *de novo* review. Here the defendant was charged with one count of intentionally and knowingly killing the victim. The second count alleged that Nicholas shot his mother with a gun, knowing that such a shooting created a strong probability of death or great bodily harm. Nicholas argues that the jury should have been able to consider involuntary manslaughter because that crime turns on the unintentional or reckless killing of another. Nicholas argues it was error for the trial court, not only to take from the jury the question of whether there was any evidence to support the involuntary manslaughter theory, but to have weighed the quality of that evidence itself.

The State responds that the trial court committed no error. The State maintains there was no evidence that the defendant acted recklessly. Nicholas testified at trial that he did not shoot his mother. He also denied the truth of his pretrial confessions. After having argued with his mother, Nicholas armed himself, met her at the front of the building, pointed a gun at her and shot it four times. The State maintains this does not support the notion of involuntary manslaughter. The jury was correctly instructed because the purpose of instructions is to inform the jury of the correct principles of law to be applied to the particular facts of a case. The defendant's assertion that he did not intend to kill anyone is not a sufficient basis to warrant an involuntary manslaughter instruction where the defendant intended to fire a gun, pointed it and shot.

"Jury instructions should guide the jury in its deliberations and help it reach the proper verdict through application of legal principles to the evidence." *People v. Moore*, 343 Ill. App. 3d 331, 338 (2003), citing *People v. Santos*, 333 Ill. App. 3d 1, 7 (2002); *People v. Williams*, 181 Ill. 2d 297, 318 (1998). "Very slight evidence of a defendant's theory of the case will justify the giving of a tendered instruction." *Moore*, 343 Ill. App. 3d at 338, citing *Santos*, 333 Ill. App. 3d at 7. "A court's decision to decline a particular instruction is subject to an abuse-of-discretion standard of review." *Moore*, 343 Ill. App. 3d at 338-39, citing *People v. Edmondson*, 328 Ill. App. 3d 661, 664 (2002); *People v. Garcia*, 188 Ill. 2d 265, 283 (1999). "Even if the trial court errs in denying a particular instruction, the decision is subject to a harmless error analysis and may be affirmed if evidence of defendant's guilt was so clear and convincing as to render the error harmless beyond a reasonable doubt." *Moore*, 343 Ill. App. 3d at 339, citing *People v. Den-*

*nis*, 181 Ill. 2d 87, 95-96 (1998), and *People v. Amaya*, 321 Ill. App. 3d 923, 929 (2001).

> "A person commits first degree murder when he 'kills an individual without lawful justification *** [and] either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to the individual or another; or *** he knows that such acts create a strong probability of death or great bodily harm to that individual or another.' 720 ILCS 5/9— 1(a)(1), (a)(2) (West 1994). In contrast, a person commits involuntary manslaughter when he 'unintentionally kills an individual without lawful justification *** [and] his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly.' [Citation.] 'The basic difference between involuntary manslaughter and first degree murder is the mental state that accompanies the conduct resulting in the victim's death.' [*People v. DiVincenzo*, 183 Ill. 2d 239, 249 (1998)]." *People v. Tainter*, 304 Ill. App. 3d 847, 849 (1999).

Involuntary manslaughter turns on recklessness. " 'A person is reckless or acts recklessly, when he *consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow*, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation.' " (Emphasis in original.) *Tainter*, 304 Ill. App. 3d at 849-50, quoting 720 ILCS 5/4—6 (West 1994). "The facts and circumstances of each case must be considered when determining whether an involuntary manslaughter instruction is warranted. [Citation.] The following factors, although not dispositive, may suggest there was evidence of recklessness that would support the giving of an involuntary manslaughter instruction: (1) the disparity in size between the defendant and the victim; (2) the brutality and duration of the beating, and the severity of the victim's injuries; and (3) whether a defendant used his bare fists or a weapon, such as a gun or a knife." *Tainter*, 304 Ill. App. 3d at 850, citing *DiVincenzo*, 183 Ill. 2d at 251.

The fact that Nicholas shot the gun three or four times does not support the claim that he was trying to scare his mother. Also, assuming he was just trying to scare his mother, the natural consequence of shooting at someone is that he or she could get shot. Nicholas intended to shoot a gun, pointed it and shot. Based on the facts of this case, merely claiming one is trying to scare someone else is insufficient to support the claim that one's actions are reckless and not intentional so as to justify an involuntary manslaughter instruction.

## Prosecutorial Misconduct

■ Nicholas next argues that the prosecutor improperly argued to the jury that the defendant was evil and repeatedly urged the jury to use his courtroom demeanor as evidence against him. During the closing arguments, the State described the shooting of multiple bullets into a victim's body, going back in the house afterwards to sleep and wondering about who was going to do the defendant's hair now that his mother was dead as "pure evil." The State also said, "Check his demeanor in the courtroom, sitting there slouched, with a big scowl on his face, takes the stand, raises his voice, cursing, actions of a guilty man."

The State responds that this issue is waived due to Nicholas' failure to object at trial or raise it in a posttrial motion. The State argues that plain error review is not appropriate here because the evidence was not closely balanced. In fact, Nicholas does not now contend that the evidence was insufficient to prove his guilt beyond a reasonable doubt. The State further argues that, despite these few comments by the prosecutor, Nicholas received a fair and impartial trial. The comments did not constitute a material factor in his conviction. Further, the State argues that, taken in context of the whole argument, the prosecutor was not calling the defendant evil but was commenting on his actions. The State should be allowed to comment on the evidence and draw inferences, even if such would be detrimental to the defendant.

"As a general rule, a defendant must object to an error at trial and include the objection in a posttrial motion to preserve it for review on appeal." *People v. Canulli*, 341 Ill. App. 3d 361, 368-69 (2003), citing *People v. Basler*, 193 Ill. 2d 545, 549 (2000); *People v. Mullen*, 141 Ill. 2d 394, 401 (1990); *People v. Casillas*, 195 Ill. 2d 461, 491 (2000); *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). The rule of waiver is a limitation on the parties and not on the courts, and a reviewing court may ignore the waiver rule in order to achieve a just result. *People v. Armstead*, 322 Ill. App. 3d 1, 11-12 (2001), citing *People v. Lopez*, 152 Ill. App. 3d 667, 676 (1987). A substantial right has been denied if the error affected the proceedings to such a degree that we cannot confidently state that the defendant's trial was fundamentally fair. *People v. Keene*, 169 Ill. 2d 1 (1995). This court will act on error that is of such gravity that it threatens the very integrity of the judicial process. *People v. Blue*, 189 Ill. 2d 99 (2000).

"Illinois reviewing courts, faced with allegations of plain error, examine, substantively, on a rudimentary level, the records before them to determine if the claimed errors constitute 'plain' and 'reversible' errors." *People v. Johnson*, 208 Ill. 2d 53, 63 (2003), citing *People*

*v. Keene*, 169 Ill. 2d 1, 17 (1995); *People v. Terrell*, 185 Ill. 2d 467, 526 (1998) (Freeman, C.J., specially concurring, joined by McMorrow, J.). "Our plain error rule is set forth in Supreme Court Rule 615(a), which states as follows: 'Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court.' " *Johnson*, 208 Ill. 2d at 63-64, quoting 134 Ill. 2d R. 615(a). "[The Illinois Supreme Court's] prior decisions make clear that this court may invoke the plain error rule to review alleged errors not properly preserved when (1) the evidence in a criminal case is closely balanced *or* (2) *the error is so fundamental and of such magnitude that the accused is denied the right to a fair trial and remedying the error is necessary to preserve the integrity of the judicial process.*" (Emphasis added.) *Johnson*, 208 Ill. 2d at 64, citing *People v. Lindsey*, 201 Ill. 2d 45, 54 (2002), quoting *People v. Nieves*, 192 Ill. 2d 487, 502-03 (2000); *People v. Hall*, 194 Ill. 2d 305, 335 (2000); *People v. Williams*, 193 Ill. 2d 306, 348 (2000). It is important to acknowledge that the supreme court in *Johnson* used the conjunction "or" in explaining when reviewing courts may invoke the plain error rule. In so doing, the supreme court recognized that certain errors are of such a magnitude that they are plain without regard to the relative closeness of the evidence.

Every defendant is entitled to fair trial free from prejudicial comments by the prosecution. *People v. Billups*, 318 Ill. App. 3d 948, 958 (2001). It is well settled that the prosecutor has wide latitude in making closing remarks. *People v. Bell*, 343 Ill. App. 3d 110, 116 (2003), citing *People v. Foster*, 322 Ill. App. 3d 780, 790 (2000); *People v. Mendez*, 318 Ill. App. 3d 1145, 1152 (2001). "A prosecutor may comment on the evidence and may draw all legitimate inferences from the evidence, even if unfavorable to the defendant." *Bell*, 343 Ill. App. 3d at 115, citing *People v. Toney*, 337 Ill. App. 3d 122, 147 (2003). Improper remarks will not merit reversal unless they result in substantial prejudice to defendant which constitutes a material factor in the conviction. *Bell*, 343 Ill. App. 3d at 116, citing *Foster*, 322 Ill. App. 3d at 790; *People v. Castaneda*, 299 Ill. App. 3d 779, 784 (1998) (reversible error results when comments by a prosecutor substantially prejudice a defendant, causing one to question whether the guilty verdict resulted from those comments); *People v. Joyner*, 317 Ill. App. 3d 93, 105 (2000) ("where a prosecutor's remarks exceed the bounds of proper comment, a reviewing court should not disturb the verdict unless it can be said that the remarks in question resulted in substantial prejudice to the accused such that absent those remarks the verdict would have been different"). In *Johnson*, the supreme court indicated the following:

"[W]e note that a pattern of intentional prosecutorial misconduct may so seriously undermine the integrity of judicial proceedings as to support reversal under the plain error doctrine. See *United States v. Young*, 470 U.S. 1, 33 n.16, 84 L. Ed. 2d 1, 24 n.16, 105 S. Ct. 1038, 1055 n.16 (1985) (Brennan, J., concurring in part and dissenting in part, joined by Marshall and Blackmun, JJ.); *People v. Moss*, 205 Ill. 2d 139, 189 (2001) (Freeman, J., concurring in part and dissenting in part, joined by Kilbride, J.). Indeed, concern over the cumulative effect of errors that 'created a pervasive pattern of unfair prejudice,' much of it attributable to misconduct of the prosecutors, is what drove this court's analysis in [*People v. Blue*, 189 Ill. 2d 99, 138-40 (2000)]. This court recognized in *Blue* the 'synergistic effect' that multiple errors of this kind can have in a trial. *Blue*, 189 Ill. 2d at 139. See also *People v. Hill*, 17 Cal. 4th 800, 847, 952 P.2d 673, 699, 72 Cal. Rptr. 2d 656, 682 (1998) (A unanimous California Supreme Court, foregoing harmless error analysis, reversed a death penalty conviction due to pervasive prosecutorial misconduct and trial errors that, cumulatively, 'created a negative synergistic effect, rendering the degree of overall unfairness to defendant more than that flowing from the sum of the individual errors')." *Johnson*, 208 Ill. 2d at 64-65.

The allegedly improper comments must be evaluated "in light of the context of the language used, its relationship to the evidence, and its effect on the defendant's right to a fair and impartial trial." *Billups*, 318 Ill. App. 3d at 958-59, citing *People v. Barker*, 298 Ill. App. 3d 751, 757 (1998); *Mendez*, 318 Ill. App. 3d at 1152, citing *People v. Morgan*, 142 Ill. 2d 410 (1991). "The trial court can generally correct any error resulting from an improper remark by sustaining an objection or instructing the jury to disregard the statement." *Bell*, 343 Ill. App. 3d at 115, citing *Foster*, 322 Ill. App. 3d at 791. Based upon the wide latitude given to prosecutors to structure the closing arguments, "the prosecutor may respond to comments made by defense counsel, denounce the activities of the defendant, and highlight inconsistencies or weaknesses in the defendant's argument." *People v. Campbell*, 332 Ill. App. 3d 721, 727 (2002), citing *People v. Sutton*, 260 Ill. App. 3d 949, 960 (1994). "While the State may comment unfavorably on the defendant and the evil results of the crime (*People v. Alvarez* (1981), 93 Ill. App. 3d 111, 416 N.E.2d 1217), he may not thereby attempt to inflame the passion of the jury nor arouse the prejudice of the jury against the defendant. (*People v. Wallace* (1981), 100 Ill. App. 3d 424, 426 N.E.2d 1017.)" *People v. Alexander*, 127 Ill. App. 3d 1007, 1014 (1984).

Multiple references to the prosecutor's opinion that the defendant and his conduct are "pure evil" are inappropriate. This prosecutor

said "and when she screams, please don't, he pulls the trigger, and pulls the trigger again and pulls the trigger again and pulls the trigger again, pure evil." There is no purpose for the addition of the phrase "pure evil" other than to inflame the passions of the jury. Though the argument has been made that the phrase was a comment on the conduct, not the person, we find that unpersuasive when coupled with the prosecutor's subsequent comments that "[h]e goes and gets rid of the gun, goes back into the house, and goes to bed, tries to get a little sleep. All that shooting and killing will tire a guy out—pure evil." Then later in the argument, the prosecutor argued "Marcel, your mom, she's dead in the street. Who's going to braid my hair now? Pure evil." Additionally, the prosecutor remarked "[a]nd it was that evil, that cold reaction that led to his capture." Rather than letting the evidence speak for itself, the prosecutor set out to paint Nicholas as evil. This is improper and, in light of the evidence in this case, unnecessary.

## CONCLUSION

In light of the foregoing, we reverse and remand this matter for a new trial.

Reversed and remanded.

CAMPBELL, P.J. and NEVILLE, J., concur.