**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 170844-U

Order filed January 5, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-17-0844 Circuit No. 17-CF-85 |
| | ) | |
| TARIUS D. GANAWAY, | ) ) | Honorable Kevin W. Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE HOLDRIDGE delivered the judgment of the court.
Justice Lytton concurred in the judgment.
Justice Schmidt concurred in part and dissented in part.

_____

**ORDER**

¶ 1     *Held*:  (1) The State's evidence was sufficient to allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt of armed robbery; and (2) the State committed reversible plain error when it implied to the jury that an acquittal would be a violation of its sworn duty.

¶ 2     The defendant, Tarius D. Ganaway, was found guilty by a jury of armed robbery, aggravated robbery, and financial institution robbery. The Peoria County circuit court sentenced the defendant to a term of 41 years' imprisonment for armed robbery, which merged with the

other offenses. The defendant raises the following arguments on appeal: (1) the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt of armed robbery; (2) the State made a series of improper statements in closing arguments amounting to prosecutorial misconduct; (3) the court improperly interfered with his right to cross-examination; (4) the court improperly interfered with his rights to present a defense and to testify on his own behalf; (5) the court made comments indicating it had abandoned its role as neutral decisionmaker; and (6) the preceding errors cumulatively prejudiced the defendant.

¶ 3                                              I. BACKGROUND

¶ 4        The State charged the defendant via indictment with armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)), aggravated robbery (*id.* § 18-1(b)(1)), and financial institution robbery (*id.* § 17-10.6(f)). The defendant represented himself at a jury trial.

¶ 5        In the State's opening comments, the prosecutor explained that the evidence would show that the defendant and an accomplice[1] robbed a bank. The prosecutor stated first that the defendant carried a revolver during the robbery, and later that the accomplice carried a sawed-off shotgun.

¶ 6        In his opening statement, the defendant conceded to the jury that he had robbed the bank:

> "First thing I want to say is I am guilty of the crime of robbery. So, *** there's no hiding that. I'm not going to lie to you. I'm not going to tell you I didn't do it. That is me in the pictures. All the stuff that the detective *** found was stuff that was mine."

---

[1]The second person involved in the robbery was never identified at trial. We refer to that person as "the accomplice" throughout our order.

The defendant stated, however, that he would prove that no guns were involved in the robbery. He also told the jury that the State had failed to "tell you about Cle Figgers or Darin Grammer or some of those other characters that played a role in this crime as well." The defendant indicated he would "show some evidence" that would change the jury's opinion.

¶ 7 The State's evidence showed that two men entered a Commerce Bank in Peoria on January 11, 2017, demanding money. Descriptions provided to police indicated that one man wore a mask and carried a compact shotgun with a wooden grip and that the other man wore no mask and carried a black handgun. Five women working at the bank during the robbery testified for the State.

¶ 8 Sarah Rivera testified that around 4 p.m. on the date in question she saw two men enter the building and run through the lobby. One man, who was not wearing a mask, jumped over the counter and was very close to her. The man was holding a small, dark-colored gun. He pointed the gun at her and demanded money from her drawer. Rivera was "focused on the gun." She identified the defendant as the man holding the small gun.

¶ 9 The defendant asked Rivera how she knew "for a fact" that he was holding an actual firearm during the robbery. Rivera admitted that she did not have experience with guns, but stated: "It certainly looked like a gun to me." When the defendant asked Rivera if she was familiar with "air assault gun[s]," Rivera testified that many of them can "look very real." With respect to whether the defendant was carrying an actual firearm, Rivera concluded: "I would not be able to say for sure."

¶ 10 Kimberly Osborne also identified the defendant as the unmasked bank robber. She recalled that the defendant was two or three feet from her and pointed a gun at her abdomen.

3

Osborne described his weapon as "a small handgun." Osborne also saw the accomplice running across the bank lobby carrying a gun. She described that weapon as a very long gun.

¶ 11    On cross-examination, the defendant asked Osborne if she could "say for sure that was actually a real gun." She responded that she could not.

¶ 12    Emily Bowlby testified that a masked man carrying a "big weapon" ran toward her in the bank. She described the weapon as long and appearing to be heavy, as the accomplice was holding it with two hands. Bowlby testified that she was moderately familiar with guns because she used to shoot guns with her father. She noted that she had seen some brown coloration on the large gun. Bowlby testified that the accomplice was directly adjacent to her—about 18 to 24 inches away—while pointing the gun at her.

¶ 13    The defendant then asked Bowlby if she could tell the difference between an "actual gun" and a BB gun. The following exchange ensued:

"[BOWLBY:] I just know that it was a gun.

[THE DEFENDANT:] So you know for a fact that it was a gun but not a B.B. gun?

A. I know it was a weapon and it's a gun.

Q. I don't mean to badger you. I'm trying to make sure I'm clarifying. You saying you know it was a gun. You know it was an actual gun or looked like it was a gun?

A. It was a weapon. It was a gun.

Q. So, can you explain to me how you know it was an actual gun?

A. By the brown that was on the gun.

Q. By brown that was on the gun. So, the gun, that was on the handle?

4

A. I know it was brown. Like the tip of it.

Q. Are you aware they make B.B. guns that also have brown on the tip of the guns?

A. Could.

Q. So you're aware of that?

A. (Witness nodded head affirmatively.)

Q. So, it's possible that was not an actual gun that you saw but a B.B. gun that had brown on it just like B.B. guns that you can buy in any local store like a Walmart or Target?

A. It was a weapon. It was a gun.

Q. But you don't know—

THE COURT: That's her answer. You have any other questions?

THE DEFENDANT: No, sir."

¶ 14   Cindy Hermann testified that around 4 p.m. on the date in question, two people ran into the bank; one approached the teller line while the other went to Bowlby's office. Hermann left her office and walked toward the teller line. At the same time, Hermann saw the accomplice had a gun pointed at Bowlby. The accomplice then ran to Hermann's location and pointed the gun at her. The gun was dark and long and appeared to be heavy. Hermann saw the defendant carrying a gun when he jumped back over the teller counter but could not describe it.

¶ 15   On cross-examination, Hermann reiterated that the accomplice's gun was dark and long, opining that it was some kind of rifle. From her brief glimpse of the defendant's gun, she could only tell that it was small. Hermann conceded that she had no experience with firearms. She did not think that she would be able to tell the difference between a BB gun and a real gun.

5

¶ 16    Lauren Ulrich testified that she was working the drive-through window with Osborne when she heard yelling and saw the defendant jump over the teller counter and run toward them. The defendant was demanding money. Osborne directed the defendant to her money drawer; Ulrich stood motionless because she had no money drawer. Ulrich testified that the defendant was carrying a gun that appeared to be a small, black revolver. Ulrich was familiar with guns from her eight years in the military. She was familiar with what a handgun looks like and testified that she was "a hundred percent certain" that the defendant was carrying a handgun. Ulrich had shot similar guns while in the military.

¶ 17    Ulrich also observed that the accomplice was carrying a gun. She testified: "It was a sawed-off shotgun. It was not long enough to not have been a sawed-off shotgun. Single barrel." Ulrich was familiar with shotguns as well, and knew that the accomplice's gun was real, adding: "Nothing about it looked like plastic."

¶ 18    Ulrich also testified that the defendant had a Black & Mild cigar in his mouth. She described Black & Mild cigars as looking like a cigar on one end with a "tan looking tip" on the other. She also noted that Black & Mild cigars smell sweet. Ulrich was familiar with that particular type of cigar because her former husband smoked them.

¶ 19    The defendant repeatedly asked Ulrich on cross-examination if she could be mistaken "about the gun" that she saw. Ulrich emphasized that there was no possibility that she was incorrect. The defendant next asked Ulrich if she could be mistaken about his cigar being a Black & Mild. Ulrich testified that she could not be 100% certain, but that the defendant's cigar looked exactly like a Black & Mild and she was not familiar with any other cigars that looked like that.

¶ 20    Surveillance footage from multiple cameras within the bank was played at trial. The footage showed the bank was generally well lit for operating hours. After entering the bank, the

accomplice walks back and forth in the main lobby area, while the defendant can be seen approaching the teller counter and jumping over it. The footage shows two women—based on their testimony, presumably Ulrich and Osborne—standing at the drive-thru window when a third woman backs into the area with her hands up. Moments later, the defendant's arm, holding the alleged gun, is stuck through the large window separating the drive-thru area from the teller counter. At this moment, the alleged gun is no more than four feet from the woman who is presumed to be Ulrich.

¶ 21    Jon Trine testified that he had spent time with the defendant in the past and had once purchased a car from him. Trine knew the defendant to regularly smoke Black & Mild cigars. Trine identified the defendant as the unmasked robber in three photographs taken from the bank surveillance footage. He also identified the cigar the defendant was smoking as a Black & Mild, based on the visible white tip.

¶ 22    Detective David Smith testified that a search of the defendant's car revealed a receipt for Nike shoes similar to those worn by the unmasked bank robber, as well as Black & Mild style cigar butts in the car's ashtray. A search of the defendant's mother's house turned up a cell phone, whose Internet history included news articles about the bank robbery. Testifying regarding still images taken from the bank surveillance footage, Smith stated that the accomplice "appear[ed] to have a sawed-off shotgun in his right hand" and that the defendant was carrying what "appear[ed] to be a revolver."

¶ 23    Smith testified on cross-examination that he believed the firearms were real based on the surveillance footage as well as his interviews with witnesses. Smith specifically credited Ulrich's statement, commenting that she, like Smith, was a military veteran with extensive firearms

7

training. Smith conceded that he did not "know for a fact" that either gun was "real." The State rested following Smith's testimony.

¶ 24    After the State rested, the defendant called Smith as his first witness. The defendant showed Smith a photograph, which Smith identified as a picture of Darin Grammer. When asked how Grammer was related to the bank robbery investigation, Smith testified that he believed Grammer was the accomplice. Smith cited Grammer's numerous contacts with the defendant prior to the robbery.

¶ 25    The defendant next asked Smith: "Did you do any surveillance on Cle Figgers[,] who is also a part of this investigation that you conducted?" Smith testified that he believed Cle Figgers was the getaway driver. Smith explained that Cle Figgers and Clemon Figgers were two different people, although sometimes Clemon Figgers went by the name Cle as well. Smith testified that he tried to speak to each of the Figgers, but they refused.

¶ 26    The defendant called Trine as his next witness. The defendant asked Trine: "Is it in my character to do something of this nature without maybe a reason behind it?" The State objected and the court told the defendant that his question was impermissible. The following exchange ensued:

        "THE COURT: You're asking this witness whether you participated in the robbery that you said you did?

        THE DEFENDANT: I'm very aware I said I participated in the robbery. I guess I'm asking if there was something behind the robbery. Would he have expected this just to have happened?

        THE COURT: I mean, based upon how he knows you and that. That's not admissible. You can testify if you'd like to. You have another question for him?

8

The defendant indicated that he had no further questions or evidence because he felt "handcuffed." The defendant did not ultimately testify at trial.

¶ 27      In its initial closing argument, the State emphasized that the witnesses who had familiarity with firearms testified that both guns involved in the robbery were real. The State added: "[T]here is not one other piece of evidence in this case that contradicts that."

¶ 28      In his closing, the defendant again conceded that he had robbed the bank. However, he declared: "I wasn't holding a firearm nor was the other person." The State objected, insisting the defendant was testifying to facts not in evidence. The court admonished the defendant that he was allowed to argue inferences from the evidence but could not present his own "thoughts of facts that are not in evidence." The defendant argued instead that the State had not met its burden in proving the firearms were real.

¶ 29      The State addressed the nature of the weapons in its rebuttal:

> "There's no evidence that these were anything but weapons. The defendant wants you to, I mean, he wants to tell you that they weren't. But was there any evidence presented to that effect? Absolutely not.
>
> The defendant took the guns with him. Don't let him minimize his behavior because he chose to take them with him.
>
> ***
>
> He chose to present evidence in this case, and he doesn't get to just blurt out in his closing argument the facts that he wants you to consider. Remember closing arguments are not evidence."

9

The State ended its rebuttal by stating: "Lives were changed forever because of the defendant's actions, and I'm asking you to do your sworn duty and find the defendant guilty of all the charges. Thank you."

¶ 30    The jury found the defendant guilty on all counts. The court sentenced him to a term of 41 years' imprisonment for armed robbery.

¶ 31                                II. ANALYSIS

¶ 32    On appeal, the defendant argues: (1) the evidence presented at trial was insufficient to prove him guilty beyond a reasonable doubt of armed robbery; (2) the State made a series of improper statements in closing arguments amounting to prosecutorial misconduct; (3) the court improperly interfered with his right to cross-examination; (4) the court improperly interfered with his rights to present a defense and to testify on his own behalf; (5) the court made comments indicating it had abandoned its role as neutral decisionmaker; and (6) the preceding errors cumulatively prejudiced the defendant.

¶ 33                         A. Sufficiency of the Evidence

¶ 34    The defendant first argues that the State's evidence was insufficient to prove him guilty beyond a reasonable doubt. It is not the purpose of a reviewing court to retry a defendant. *People v. Milka*, 211 Ill. 2d 150, 178 (2004). Rather, a conviction will be affirmed on review where, considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense proven beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). In considering whether the evidence at trial was sufficient, all reasonable inferences from the record in favor of the prosecution will be allowed. *People v. Bush*, 214 Ill. 2d 318, 326 (2005). Moreover, it is the province of the jury to assess the credibility of witnesses and resolve conflicts in the evidence, and its determinations in those

10

regards are entitled to great deference. *People v. Washington*, 2012 IL 110283, ¶ 60; *People v. Wheeler*, 226 Ill. 2d 92, 115 (2007). The positive testimony of even a single credible witness is sufficient to convict, even where that testimony is contradicted by the accused. *People v. Gray*, 2017 IL 120958, ¶ 36.

¶ 35       The defendant disputes only the sufficiency of the evidence of armed robbery; he concedes that the State proved him guilty beyond a reasonable doubt of aggravated robbery and financial institution robbery. Armed robbery, as charged by the State here, requires proof that the defendant was actually armed with a firearm in the course of the robbery.[2] 720 ILCS 5/18-2 (West 2016). For the purposes of the armed robbery statute, a firearm is defined as any device "designed to expel a projectile or projectiles by the action of an explosion, expansion of gas or escape of gas." 430 ILCS 65/1.1 (West 2016); 720 ILCS 5/2-7.5 (West 2016).

¶ 36       In *People v. Washington*, 2012 IL 107993, ¶ 35, our supreme court found the State's evidence of the use of a dangerous weapon was sufficient where one witness had an extended and unobstructed view of the weapon used in the commission of the crime, and testified that it was a gun. The court held that, given the victim's "unequivocal testimony and the circumstances under which he was able to view the gun, the jury could have reasonably inferred that defendant possessed a real gun." *Id.* ¶ 36. The court recently reaffirmed its decision in *Washington* in *People v. McLaurin*, 2020 IL 124563, ¶¶ 34-35, in which it found that the testimony of a single witness who had familiarity with handguns was sufficient to sustain a conviction.

¶ 37       In the case at hand, six witnesses testified that either the defendant or his accomplice was carrying a gun in the course of the robbery. The most compelling of these witnesses was Ulrich,

---

[2]Aggravated robbery, on the other hand, requires only proof that the defendant indicated by his words or actions that he was carrying a firearm, regardless of whether he was in fact doing so. 720 ILCS 5/18-1(b)(1) (West 2016).

who testified that the defendant was carrying a small, black revolver and that the accomplice was carrying a single-barrel sawed-off shotgun. Ulrich was "a hundred percent certain" that the defendant was carrying a gun. Ulrich had eight years of military experience and was familiar with both types of guns based on her training. On cross-examination, Ulrich testified that there was no possibility that she was incorrect about the guns.

¶ 38    On appeal, the defendant asserts that Ulrich's testimony was not credible. First, he argues that her testimony regarding the sawed-off shotgun was "suspect" because it would be difficult to determine if the accomplice was holding a real firearm "from an obstructed view so far away." The defendant also argues that Ulrich "equivocated" in her testimony regarding Black & Mild cigars, first testifying that the defendant was smoking a Black & Mild, but later admitting that she could not be 100% certain of that fact.

¶ 39    Neither of the purported issues with Ulrich's testimony actually undermines her testimony that the defendant was carrying a black revolver. Ulrich did not testify that her view of the accomplice was in any way obstructed or distant, nor did the surveillance footage give such an impression. In fact, the footage showed that Ulrich was standing mere feet from the defendant's weapon and was able to observe the entire robbery from that point forward in the well-lit bank. Further, it is unclear how Ulrich's testimony about the defendant's cigar impacts her testimony about the gun. A person may be certain of one fact but less certain of some other, unrelated fact.

¶ 40    In finding the defendant guilty of armed robbery, the jury necessarily found Ulrich's testimony credible. Indeed, Ulrich's testimony was not so unreasonable that no rationale trier of fact could have found her credible. See *People v. Smith*, 185 Ill. 2d 532, 545 (1999). Like the lone witness in *Washington*, Ulrich's testimony was unequivocal and the circumstances under

12

which she was able to see the gun were favorable. See *Washington*, 2012 IL 107993, ¶ 36. Like the witness in *McLaurin*, Ulrich had many years of experience and training with firearms. See *McLaurin*, 2020 IL 124563, ¶ 34. The positive testimony of a single credible witness is sufficient to convict. *Gray*, 2017 IL 120958, ¶ 36. In the present case, Ulrich was just such a witness. We therefore find that a rationale trier of fact could find beyond a reasonable doubt that the defendant was carrying an actual firearm in the course of the bank robbery, and could thus find the defendant guilty of armed robbery.

¶ 41        In reaching this conclusion, we recognize that the testimony from the other five witnesses concerning the firearm was imperfect. While Smith was a military veteran with extensive knowledge of firearms, the basis of his testimony was merely his viewing of the surveillance footage and still photographs taken therefrom. Rivera, Osborne, Bowlby, and Hermann each testified that they were in close proximity to at least one of the guns, but also expressed varying levels of uncertainty as to their identification of the firearms. While their testimony was partially impeached, that impeachment did nothing to undermine Ulrich, whose testimony was unequivocal and unimpeached.

¶ 42                                    B. Closing Arguments

¶ 43        The defendant next raises several arguments related to the closing arguments at trial. Namely, he contends that the State erred when it incorrectly told the jury that the evidence was uncontradicted, shifted the burden of proof to the defendant, and told the jury it was their sworn duty to find the defendant guilty. The defendant concedes that he failed to preserve each of those claims, and requests that we review the issues under the plain error doctrine. Because we find that the latter of the defendant's claims—that the State committed error by telling the jury it had

a sworn duty to convict—itself amounts to reversible error, we need not consider other potential errors related to closing arguments.

¶ 44       The first step in any plain-error analysis is to determine whether a clear, obvious, or plain error has been committed. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). "The word 'plain' here is synonymous with 'clear' and is the equivalent of 'obvious.' " *Id.* at 565 n.2. If the reviewing court finds that a clear or obvious error has occurred, it is a defendant's burden to demonstrate that the error was prejudicial and thus reversible. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010). A defendant may demonstrate prejudice in two ways. Under the first prong of the plain error doctrine, an error will be deemed reversible where the evidence at trial was so closely balanced that the error threatened to tip the scales of justice against the defendant. *Piatkowski*, 225 Ill. 2d at 565.

¶ 45       Under the second prong, which we apply here, a reviewing court will reverse where the error committed was so serious that prejudice must be presumed. *People v. Herron*, 215 Ill. 2d 167, 185 (2005) Reversible error under the second prong of the plain error doctrine has been equated with the concept of "structural error." *People v. Clark*, 2016 IL 118845, ¶ 25. Structural error has been defined as "a systemic error which serves to 'erode the integrity of the judicial process and undermine the fairness of the [proceedings].' " *People v. Glasper*, 234 Ill. 2d 173, 197-98 (2009) (quoting *Herron*, 215 Ill. 2d at 186); see also *Thompson*, 238 Ill. 2d at 609 ("An error is typically designated as structural only if it necessarily renders a criminal trial fundamentally unfair or an unreliable means of determining guilt or innocence."). A structural error, whether preserved or unpreserved, mandates automatic reversal. *People v. Stoecker*, 2020 IL 124807, ¶ 23; *Thompson*, 238 Ill. 2d at 608.

14

¶ 46    In *People v. Nelson*, 193 Ill. 2d 216, 226-27 (2000), the State's rebuttal argument concluded as follows:

"When we get down to it and the case gets into your hands, you took an oath to well and truly try the issues in this case. We've all taken oaths. [Defense counsel] and I took an oath when we became lawyers. The Judge took a similar oath—took an oath when he became a judge. We present our cases. We argue it to you. The witnesses took an oath and told you what they said.

The Judge will instruct you on the law, but you took an oath to well and truly try the issues. And part of that oath is what you come in here you don't just forget everything you learned in your entire life. You bring in here your obligation to judge it on your common sense. And your oath is to enforce the law when the law has been proven if the evidence proves it.

Whenever a jury acquits a person who has been proven guilty they don't follow their oaths. And if you let the defendant, Tracy Nelson, walk out of this courtroom on this evidence I would suggest you have not lived up to your oaths.

Many lawyers thank the jury at this point. I don't. I'm not going to thank you today, because you haven't earned that thanks yet. You earn the thanks of the People of the State of Illinois when you rule on the evidence and find in this case on this evidence the defendant guilty. Only when you have come to your verdict have you finished your job.

And you are now the people that you read about in the paper all the time those people—how could they let that guy go? How could they convict [*sic*] that guy? You're those people now.

15

> And I would suggest your oaths require you on the evidence here, * * * you can see that the defendant is guilty. And I would suggest your oaths require you to find him guilty on this evidence."

Our supreme court found that that argument was "wholly inappropriate" and amounted to prosecutorial misconduct. *Id.* at 227. The court endorsed the notion that

> " '[R]emarks implying that jurors will violate their oaths if they fail to convict *** are improper. [Citations.] *** Although the prosecution in a criminal case may use forceful language in summing up the State's case [citation], it may not, as here, explicitly tell the jurors that they are obligated by their oath to return a particular verdict.' " *Id.* at 227-28 (quoting *New Jersey v. Pennington*, 575 A.2d 816, 831 (1990)).

The *Nelson* court concluded: "This fundamental error casts significant doubt on the reliability of the jury's verdict." *Id.* at 228.

¶ 47    We find that *Nelson* controls the outcome in the instant case. Here the State told the jury: "I'm asking you to do your sworn duty and find the defendant guilty of all the charges." The plain implication of that statement is that the jury would be in violation of its sworn duty if it did *not* find the defendant guilty of all the charges. In these circumstances, we cannot say whether the jury's guilty verdicts were the product of a reasoned determination that the State had proven its charges beyond a reasonable doubt, or the belief that such a result was mandated by the jury's oath. As the *Nelson* court found, the error casts significant doubt on the reliability of the jury's verdict.

¶ 48    Because the State's egregious error rendered the defendant's trial "an unreliable means of determining guilt or innocence," we find the error was structural in nature, vacate the defendant's

16

convictions and sentences pursuant to the second prong of the plain error doctrine, and remand for further proceedings. *Thompson*, 238 Ill. 2d at 609. While this finding obviates the need for this court to consider the remaining claims of error raised by the defendant (see *supra* ¶ 32), the circuit court should nevertheless be cognizant of those contentions at a potential retrial.

¶ 49                                    III. CONCLUSION

¶ 50        The judgment of the circuit court of Peoria County is vacated and the matter is remanded for further proceedings.

¶ 51        Vacated and remanded.

¶ 52        JUSTICE SCHMIDT, concurring in part and dissenting in part:

¶ 53        The evidence presented by the State was unquestionably sufficient to sustain defendant's conviction on appeal. Furthermore, the State's brief allusion to the jury's "sworn duty" did not rise to the level of error, let alone structural error giving rise to automatic reversal. We should affirm defendant's convictions.

¶ 54        The State's comment in the present case is qualitatively and quantitatively unlike any comment that has been deemed error in this context. In *Nelson*, the sole case relied upon by the majority, the State mentioned an oath no fewer than 12 times over the course of its rebuttal argument. *Nelson*, 193 Ill. 2d at 226-27. The oath was nothing less than the centerpiece of that argument, concluding with the prosecutor's blunt statement that a guilty verdict was required by that oath. *Id.* at 227. In *People v. Castaneda*, 299 Ill. App. 3d 779, 783 (1998), a case cited approvingly by the *Nelson* court, the State ended its argument with three paragraphs about the jury's oath, again including the direct assertion that a guilty verdict would be an abrogation of that oath. Finally, in *State v. Pennington*, 119 N.J. 547, 575 (1990)—a case relied upon by both the *Nelson* and *Castaneda* courts—the State told the jury that its oath required a guilty verdict.

17

Further, the State was especially melodramatic in its repeated references to that oath. *Id.* ("Consider your oath, not as old words and cold paper, but as a warm and solemn obligation to tell the truth, the obligation of flesh and blood to flesh and blood.").

¶ 55    In short, the single comment at issue in this case is nothing like those described above. Here, the State concluded its rebuttal argument by stating: "I'm asking you to do your sworn duty and find the defendant guilty of all the charges." It made no further references to any sworn duty or oath. It never stated that an acquittal would be a violation of the jury's oath. The majority declines to acknowledge the stark contrast between this comment and those in which reversible error has been found. Further, I am aware of no case supporting the notion that *any* reference to the jury's oath, no matter how brief or fleeting, is error. In fact, our supreme court itself made the opposite abundantly clear in *People v. Kidd*, 175 Ill. 2d 1, 47-48 (1996). In that case, the State argued that the jury would be violating its oath by finding the defendant ineligible for the death penalty. The supreme court found no error, commenting that the argument was "unobjectionable" and "a fair reply to defense counsel's own impassioned appeal." *Id.* at 48. The brief reference to a sworn duty in this case is even less offensive than the argument at question in *Kidd*. Accordingly, there was no error.

¶ 56    Even if the single comment in question here could be considered error, it is certainly not structural error. Contrary to the majority's holding, the court in *Nelson* neither stated nor implied that *every* reference to the jury's oath should be considered structural error, such that *Nelson* could be said to "control" the outcome in this case. Indeed, any such holding would conflict with prior precedent. Our supreme court has made clear that improper argument will only amount to structural error or second prong plain error in extreme circumstances. See *People v. Albanese*, 104 Ill. 2d 504, 518 (1984) (finding plain error only where prosecutor's comments "were so

18

inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process"); *People v. Johnson*, 208 Ill. 2d 53, 85 (2003) (finding that "pervasive prosecutorial misconduct" amounts to structural error). The State's isolated remark in this case was not inflammatory, flagrant, or pervasive. In short, there was no structural error.

¶ 57 The State committed no error in referencing the jury's sworn duty. Even if one assumes that an error was committed, it was not structural error, and the evidence in this case was not closely balanced. Accordingly, under either theory, there are no grounds upon which to vacate defendant's convictions.

¶ 58 I would affirm.